803 A.2d 1204

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Stephen Barry SCHER, Appellee.**

Supreme Court of Pennsylvania.

Argued May 2, 2002.

Decided Aug. 20, 2002.

Reargument Denied October 7, 2002.

286

D. Michael Fisher, Atty. Gen., William H. Ryan, Jr., Robert A. Graci, Marianne Kreisher Fogelsanger, Harrisburg, for Commonwealth.

John P. Moses, Moses & Gelso, LLP, Wilkes Barre, for Stephen Barry Scher.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

Justice NEWMAN.

■ We granted the Commonwealth's Petition for Allowance of Appeal to decide whether the Commonwealth violated Stephen Barry Scher's (Scher) rights to due process of law under the United States Constitution and Article 1, Section 9 of the Constitution of Pennsylvania by the twenty-year delay in charging Scher with the murder of Martin Dillon (Dillon). We find that the twenty-year delay did not violate the due process rights of Scher and reverse the Superior Court.

### FACTUAL AND PROCEDURAL HISTORY

Martin Dillon died of a gunshot wound to the chest on June 2, 1976 at the Dillon family recreational property called "Gunsmoke" in Susquehanna County. Scher was the only other individual present when Dillon died. How Dillon died, and whether that death was an accident or an intentional act of murder, is a story that evolved in fits and starts in the intervening two decades, culminating in murder charges being filed against Scher in 1996 and his conviction for first degree murder following a six-week jury trial in 1997. Resolution of this appeal requires an understanding of how the scene where Dillon lay dead appeared in 1976; what the investigators initially concluded concerning Dillon's death and how that investigation was conducted; what a succession of prosecutors did with respect to this suspicious death; why the Susquehanna County District Attorney's Office finally decided to reopen the case; and, most important, how the lies that Scher related to investigators and his staging of the scene to make it appear that Dillon died accidentally impacted the investigation.

 

## The Scene

Andrew Russin, a neighbor whose house was approximately two miles from Gunsmoke, testified that, on the day Dillon died, Scher appeared at Russin's house with his hands and mouth covered in blood and asked Russin to call the authorities because Dillon had been shot. Scher appeared upset but was not crying. Russin did not know whom to call, so Scher made the telephone call himself. The two proceeded to Gunsmoke, each in his own vehicle, while Russin's son stood by the entrance of the road that leads to Gunsmoke to direct the ambulance and the police when they arrived. After the two arrived at Gunsmoke and parked near the Dillons' trailer, Scher led Russin to the path towards the skeet shooting area, where Russin saw Dillon's body. Russin testified that Dillon's chest was saturated in blood and that he placed a blanket over Dillon's body. Russin then watched as Scher picked up the gun that was lying near Dillon's body and smashed it against a tree, breaking the barrel from the stock.

Trooper William Hairston of the Pennsylvania State Police, Gibson barracks, arrived at Gunsmoke with John Conarton, the Susquehanna County Coroner, at approximately 7:25 p.m.[1] Trooper Hairston parked his vehicle near the Dillon family trailer and walked up the path that led to a clearing where Dillon's body lay on its back. A pair of hunting goggles and shooting "earmuffs" were on the ground nearby. Trooper Hairston observed that the earmuffs had blood on them. There was a puddle of blood to the left side of Dillon's body.

Trooper Hairston and Coroner Conarton returned to the trailer area where Scher was sitting, with the door open, in the passenger side of a car. Trooper Hairston, with Coroner Conarton present, took a statement from Scher. In his June 2, 1976 statement, Scher told Trooper Hairston: (1) he and Dillon had come to Gunsmoke to skeet shoot; (2) after firing about twenty rounds, they decided to take a break and re-

1. Other individuals, including a Pennsylvania game commissioner and members of the Silver Lake Ambulance corps, were already at the scene when Trooper Hairston—the first investigating officer at the scene—and Coroner Conarton arrived.

turned to the trailer for some beer and potato chips; (3) the two sat in the trailer discussing an upcoming murder trial in which Dillon, a lawyer, was representing the defendant; (4) they then went back to the trail towards the clearing where the skeet-shooting trap was set up and fired a few more rounds; (5) Dillon then wanted to go back to the trailer to get cigarettes, so Scher loaded his shotgun, a sixteen-gauge, to be ready for the next round of firing, while Dillon unloaded his twenty-gauge shotgun and placed it on a nearby stump; (6) Scher and Dillon then walked down the trail, and Scher placed his loaded shotgun on a metal gun stand, approximately 120 feet from the skeet-shooting area; (7) as they went further down the trail, Dillon turned around and saw something in the open field that he thought was a porcupine, ran back up the trail and grabbed Scher's gun from the stand; (8) Scher heard Dillon cock the gun and heard it fire, but he could not see Dillon; (9) Scher then walked up the trail and found Dillon lying on the ground, face down; (10) Scher, a physician, ran up to Dillon and turned him over, saw that Dillon was bleeding from the chest and tried to stop the bleeding, but knew that Dillon was dead; (11) Scher took the car keys from Dillon's pocket and drove to Russin's house; (12) Scher and Russin returned to the scene, and Scher noticed that the trigger of the sixteen-gauge shotgun had a twig in it; (13) Scher then smashed the shotgun against the tree, and stated, "I know I shouldn't have done that." This June 2, 1976 statement to Trooper Hairston, as Scher's trial testimony more than twenty years later admitted, was a lie.

Carol Gazda, who arrived at Gunsmoke on June 2, 1976, along with her husband and other members of the Silver Lake Ambulance corps who were responding to the report of a hunting accident, testified at the 1996 trial concerning Scher's unusual demeanor at the scene:

Q: I want you to go on in your own words and tell this jury exactly what you saw and heard.

A: Okay. There was a gentleman in the vehicle in front of me, I believe, standing next to it. And he seemed okay. He was just looking around, you know, normal. And then

when someone came near him to talk to him, he would get very emotional and start, you know, like, My [sic] best friend is dead, I can't believe he's dead, my best friend is dead, I can't believe it. When they left, he seemed fine again, like he was previous when he was alone. And when somebody came again, he'd do the same thing. It was kind of strange to me, but I had no idea who he was.

* * *

Q: Now, did you at some point find out who this person was—

A: It was—

Q: What his name was at least?

A: —later in that hour someone mentioned, I believe, Dr. Scher. . . .

Notes of Testimony, 9/24/97, pp. 156–57.

Trooper Francis Zanin of the Pennsylvania State Police, Dunmore barracks, was the records and identification officer who documented the scene on June 2, 1976. Trooper Zanin observed Dillon's body lying on its back with its arms outstretched. Dillon was wearing eight-inch high boots that had round eyelets for the laces to pass through except at the top, where the laces would pass through three hooks. Trooper Zanin noticed that although the laces at the top of the right-foot boot were untied, the rest of the laces remained pulled tightly against the leg. He also noticed that Dillon's pant leg was pulled up higher than the boot. There were blood droplets on Dillon's boots and face, on the shooting goggles and protective eyewear that lay nearby, and on the tree stump that was approximately five-and-a-half to six feet from Dillon's body. Trooper Zanin observed, however, that there were no blood droplets immediately around Dillon's eyes and ears where the goggles and earmuffs would have been had Dillon been wearing them when he was shot. The barrel of the shattered sixteen-gauge shotgun lay close to Dillon's body, but a subsequent examination of the outside and inside of the shotgun barrel showed no evidence of blood. Inside the chamber of the broken sixteen-gauge shotgun was a dis-

charged number four load high brass magnum shell—a variety not commonly used in skeet shooting. Beneath Dillon's left hand were unbroken clay pigeons.

### The Initial Investigation

On June 4, 1976, at 11:30 a.m., two days after his statement to Trooper Hairston, Scher came to the District Attorney's Office at the Susquehanna County Courthouse in Montrose, at the request of the investigators, and gave a statement. At the interview were Williard Collier, the detective for the Susquehanna County District Attorney's office, Troopers John Salinkas and John Fekette of the Pennsylvania State Police, and a secretary from the Susquehanna County District Attorney's office. At the commencement of questioning, Trooper Fekette advised Scher of his *Miranda* rights, which Scher waived and agreed to be questioned without a lawyer present. During this interrogation, Scher repeated essentially the same story that he had related in his June 2, 1976 statement to Trooper Hairston. Scher explained that he and Dillon had gone to Gunsmoke to go skeet shooting, that they were returning to the trailer to get cigarettes, that Dillon thought he saw a porcupine and ran up the path to pursue it, and that Scher heard the shot and followed after, where he found Dillon lying on the ground with a gunshot wound to the chest. One noteworthy difference between this second statement and the June 2, 1976 statement was that Scher said that he had placed the sixteen-gauge shotgun against a tree, whereas his June 2, 1976 statement indicated that he had placed the loaded shotgun on the metal gun stand. When asked whether he and Dillon had any disagreements, Scher said, "No. We were talking about this rumor. I told him I was thinking of leaving town. It was rough on him. He sat and told me I was just a quitter and chicken—'don't run away ... it was just small people talking.'" After giving this answer, Scher became angry, terminated the interview, and left the room.

Edward Little, the District Attorney of Susquehanna County from 1968 to 1980, testified at pretrial hearings on Scher's Motion to Dismiss as to the state of the investigation in June

of 1976, and explained why no charges were filed during his tenure in office. Dr. James Grace, a general practitioner who conducted an autopsy [2] of Dillon on June 3, 1976, had issued a report that explained, "[h]istory given of [Dillon's death] having been involved in a hunting accident," and listed the cause of death as "gunshot wound of the chest," but made no determination whether the death was the result of a homicide. Coroner Conarton,[3] who was present when Scher gave his June 2, 1976 statement to Trooper Hairston, had determined that Dillon's death was accidental and had listed this as the manner of death on Dillon's death certificate. Although Detective Collier had a strong belief that Dillon's death may have been a murder rather than an accident, and expressed this opinion in a June 9, 1976 report[4] to Little, Scher was not arrested. Little explained that he, too, was not convinced that Dillon's death was an accident and requested that Coroner Conarton delay issuance of the death certificate in order to allow additional time to conduct the investigation. Little testified, however, that he never brought charges against Scher because he felt that there was insufficient evidence of murder to prosecute the case successfully.

Laurence Kelly succeeded Little as District Attorney of Susquehanna County in 1980, and held that office until 1988. Little testified that he had no discussions with Kelly regarding the investigation into Dillon's death. Kelly confirmed that:

**2.** When Dr. Grace performed the autopsy, the funeral director who had charge of Dillon's body had already sutured the wound to Dillon's chest.

**3.** Coroner Conarton was not a medical doctor. This is not unusual in smaller counties, because there is no requirement that a coroner have formal medical training in order to hold office. *See* 16 P.S. § 413. Indeed, it was not until 1988 that the legislature prescribed a course of professional education that all newly-elected coroners must complete, which includes training in crime-scene investigation, toxicology, and forensic autopsies. *See* 16 P.S. §§ 9525.2–9525.3.

**4.** In this report, Detective Collier explained that "an examination of the scene, the angle of the wound of entrance and information available at present are not satisfactory to this investigator as being caused by a fall on the weapon." Notes of Testimony, 5/7/97 p. 82. Detective Collier also expressed in this report that "the physiognomy of one subject, his partial destruction of the weapon and his explanation of the incident are not satisfactory to this investigator." *Id.*

(1) he had no conversation with either Little or Detective Collier concerning Dillon's death; (2) he did not know where in the office the investigative file on the Dillon matter was located, nor did he look for it; (3) he did not initiate any investigation concerning the death of Dillon; (4) he gathered no additional evidence into Dillon's death; (5) he conducted no review of the evidence gathered during the initial investigation; and, (6) he never met with anyone from the Pennsylvania State Police regarding the Dillon case. For eight years, therefore, the investigation into the Dillon matter was dormant.

## The Reactivated Investigation

Jeffrey Snyder was the District Attorney of Susquehanna County from 1988 until 1996. In 1989, District Attorney Snyder received a telephone call from Al Riemel, a social acquaintance of the Snyder family and the brother-in-law of Martin Dillon, requesting a meeting at the home of Lawrence Dillon, the father of Martin Dillon. Prior to this telephone call, Snyder had not conducted any review of the Dillon case, but had the District Attorney's Office investigative file retrieved from storage in order to review the matter. District Attorney Snyder reviewed the Dillon file, but found that it contained "little to no information" and decided to meet with the state police to discuss the status of the case. At the behest of Lawrence Dillon, Snyder arranged meetings with the original Pennsylvania State Police investigators, Troopers John Salinkas and John Fekette, and reviewed the state police investigative file. District Attorney Snyder agreed to have the facts as developed by the investigation to that point presented to a panel of medical experts who were holding a conference at the University of Pennsylvania, in Philadelphia. In May of 1989, Snyder went to the conference to "get some consensus from those in the forensic field" about whether Dillon died by accident or was murdered. The conference attendees consisted of medical examiners, pathologists, and coroners. Three members of the Pennsylvania State Police accompanied Snyder to the conference, along with Dr. Isadore Mihalikis, a forensic pathologist who actually presented the

case to the conference attendees.[5] Following this presentation, a significant majority of the conference members opined that a self-inflicted gunshot wound, either accidental or intentional, caused Dillon's death. Snyder viewed this vote as "an overwhelming defeat for the prosecution" and concluded that no successful prosecution could be mounted at that time. Although the investigation remained open, the Susquehanna County District Attorney's Office took no substantial steps to advance the investigation for the next five years.

In 1990 and 1991, Lawrence Dillon retained private investigators to look into the case and unsuccessfully petitioned to have Dillon's body exhumed for another autopsy. At that time, Snyder felt that the efforts of the Dillon family were counterproductive to a successful resumption of the investigation.[6] However, in 1994, again at the urging of the Dillon family, two Pennsylvania State Police officers who had no previous involvement in the case were brought in to reexamine the evidence, conduct interviews with witnesses, and, in Snyder's words, "winnow out the rumor, the innuendo, that in my opinion riddled much of the material that was already on file." The "rumor" referred to by Snyder was the report that Scher and Dillon's wife, Patricia,[7] had been having an affair before Dillon's death. These rumors were known to investigators at the time of the incident but, for reasons that do not appear in the record, were not pursued. The officers who were placed in charge of the state police investigation in 1994 reinterviewed witnesses and interviewed additional witnesses who had not been questioned in 1976. Based on this renewed investigation, the Commonwealth finally developed evidence of a motive for Scher to murder Dillon that had not been developed in the earlier investigation: namely, that Scher and Patricia had been having an extramarital affair prior to Dillon's death. In 1995, the Commonwealth successfully peti-

5. This presentation included photographs from the autopsy conducted by Dr. Grace in June of 1976.

6. Snyder feared that the Dillon family's private investigative activities in the early 90s would pressure him into arresting Scher prematurely when there would be little chance of a successful prosecution.

7. Patricia Dillon is now Patricia Scher, having married Scher in 1978.

tioned, in spite of the objection of Patricia Scher,[8] to have Dillon's body exhumed for a second autopsy. Following this second autopsy in April of 1995, the Commonwealth obtained support from its expert forensic pathologist, Dr. Mihalikis, for the position that the physical evidence of Dillon's gunshot wound was not consistent with an accidental discharge of a dropped shotgun. The Commonwealth [9] concluded that it possessed sufficient evidence to prosecute murder charges successfully and charged Scher with first-degree murder in June of 1996.

### Scher's Trial Testimony

The Commonwealth's theory of the case was that the physical evidence (i.e., the condition of the gunshot wound, the angle of the wound, the appearance of Dillon's body at the scene, blood spatter on Scher's boots) was inconsistent with Scher's story—and the conclusion of those involved in the initial investigation—that Dillon died from an accidental gunshot wound. Accordingly, the Commonwealth presented expert testimony to support its theory that Dillon could not have been shot accidentally by a dropped shotgun. The Commonwealth also presented testimony from witnesses to support its theory of motive that Scher had been having an affair with Patricia and that Dillon knew about it.

Confronted with the Commonwealth's case, Scher took the stand and admitted that his previous statements to the investigators in June of 1976 were false. He proceeded to explain what happened that day at Gunsmoke.

8. In court proceedings to contest the Commonwealth's exhumation petition, Patricia denied that she and Scher had been having an affair. Indeed, Scher and Patricia called a press conference, at which they denied the rumors that they had been having an affair prior to Dillon's death. These denials were consistent with Scher's sworn statements in 1976 in court papers in the divorce proceedings from Scher's first marriage where Scher denied that he and Patricia had been having an extramarital affair. Scher later conceded at trial that he committed perjury, and that these sworn denials of an affair with Patricia were lies under oath. In fact, as Scher admitted at trial, he and Patricia had been having an affair.

9. The Attorney General's office assumed prosecution of the case from the Susquehanna District Attorney's Office.

A: Well, 3:00 [p.m., June 2, 1976] came and I was ready to go. I had my clothes on that I was going to wear to Gunsmoke. And Marty [Dillon] wasn't there.... So I got everything out of my house to put into my car. I took hamburger buns and relish and ketchup and mustard and potato chips; and I took my gun, the sixteen-gauge shotgun, and some clay birds and some ammunition to—and put it in the trunk of my car. I waited for Marty until about 3:15 p.m. when he showed up....

And I asked Marty, Do you still want to go? ... Marty said, Yeah, I just bought a whole bunch of hamburger meat, let's go.

* * *

And we drove right up the road into Gunsmoke to the trailer there, the cabin. We got out, and we took out the food things, took out all the food stuff that we had to take up to the trailer.

We sat down on the porch, and we had a beer and a cigarette, just unwound. Then from that point on, after finishing the beer, we put a couple beers in our pockets, actually, one each. We went back to the car and got the stuff we were going to shoot with. We got the clay birds and the ammunition and the guns and the bird thrower machine.

* * *

We got up the trail to where we—there was a clearing where we shot clay birds. We set up the machine, the machine that throws out the clay birds, spring action.

Q: Let me interrupt you a minute, Doctor. When you got out at Gunsmoke and you took the food and stuff up to [sic] trailer and you sat and smoked cigarettes and drank beer, what did you talk about?

A: We talked about quite a couple of things ....we talked about Marty's upcoming trial that he was made a public defender. It was a murder case and he never tried a murder case. He talked to me a little bit about that trial.

And that was about it before we finished our beer and went back up the trailer with the guns and—

Q: I'm sorry for interrupting you. What happened after that discussion?

A: Well, that's when we went up to get the shooting paraphernalia. We walked up the Jeep trail to the clearing. And we set up the bird thrower and put down the boxes and started shooting.

\* \* \*

Anyhow, we shot up about five or six rounds of ten. And the guns were hot, so we put them down. And we also ran out of clay birds. So we had to go back down the trail to the cabin and the car to get some more clay birds.

We got to the cabin and we sat down and we drank a couple more beers, had a couple more cigarettes. We opened up some potato chips and ate the chips and talked before going back out there.

Q: What did you talk about this time?

A: Mostly we talked about the murder trial that he was going to be a defendant [sic] for. . . . We talked a little bit about my divorce proceeding. And then we left. We went out shooting again.

So we walked back up the trail to the clearing. This time I shot first. He threw out ten birds for me, and then I threw off ten birds for him. He was still using the same gun, and I was still using the twenty gauge.

Then my second round of ten, at the very end of the last shot, he turned to me, he said, Ann came to me and told me that you told her that you love Pat.

I said, When did that happen? And I put down the twenty gauge and I broke it in half and put it on the log. And I walked over to him to his side.

He said, it doesn't matter when it happened.

I said, Do you believe her?

He said, I don't know. She's crazy. I don't know whether to believe her or not. But with all the rumors and talk and gossip and gossip [sic] in town and my father's breath-

ing down my neck about this gossip, I really—I need to know. And he stopped and he looked down at the ground and it was like he—it was like he really didn't want to know, but, you know, but then he looked up. He looked right at me in the eye. He said, I have to know. Are you and Pat having an affair?

And I just had—I had to tell him the truth. He was looking me in the eye. I could no longer keep it from him. I said, Yes, we're having, not a love affair, but a physical affair.

And then he became very anxious and very, very upset. He was sitting there on the log and he had his hand over his ears and he was rocking down and asked me a whole bunch of questions. And I don't—I don't remember his exact words, how he phrased the questions. I don't even remember the order that he asked them, but he wanted to know from me, he wanted to know how did this start.

I told him it just happened. Pat and I were close together all the time. It just happened.

* * *

I was embarrassed to talk to him this way, of course. I was looking at the ground. I said to him, You know, this is as much your fault as it is anybody's.

Then I hear a scream, yell. And I look up and he has the sixteen gauge gun in his hand, reached around and I—I knew—I just knew I had to get that gun away. I had to get it. I didn't know what he was going to do with it. I just knew with his state of mind at that time and my state of mind that it wasn't good to have a hold of a gun and I lunged. In a matter of that much time, I grabbed the gun and pulled away (indicating). We struggled and the gun went off.

Notes of Testimony, 10/6/97, pp. 90–92, 94–100.

Scher then explained why he decided to engage in a cover-up of and why he had lied to investigators, to the press, and to the public for the next twenty-one years.

I was thinking, How can I tell anybody this accident happened like this and have anybody believe me in Montrose, what with all the rumors that were going on and me being a relative newcomer to the area and Marty's father is the mayor and I'm the only Jew in town, in the county? And I felt I couldn't tell anybody.

\* \* \*

And I decided since it was an accident that I was going to make it into another accident. I couldn't face the public telling them the right truth of an accident. I had to make something up of another accident. So I made up the story about him running with the gun and tripping and falling. I was afraid that I would be convicted if I didn't—and if I was convicted, I'd never be able to practice medicine again.

So I made up that story and took the gun that I dropped right when it discharged and wiped off the barrel with a handkerchief and put it back into my pocket. I took the gun and I put it with the muzzle facing his head where he laid. Then I untied his shoelace to make it look like there was something he tripped over. And I ran back down the trail to the cabin, past the cabin. I was going to go tell Mr. Russin to get help.

N.T., 10/6/97, pp. 102–03.

The jury convicted Scher of first-degree murder and the trial court sentenced him to life imprisonment on October 22, 1997. On appeal to the Superior Court, Scher raised numerous issues, including the claim that the twenty-year delay in filing charges against him violated his right to due process of law as guaranteed by the United States and Pennsylvania Constitutions. The Superior Court reversed the Judgment of Sentence and discharged Scher, concluding that the Commonwealth had violated Scher's due process rights by delaying twenty years in charging him with murder. *Commonwealth v. Scher*, 732 A.2d 1278 (Pa.Super.1999). We granted the Commonwealth's Petition for Allowance of Appeal to address the question of when pre-indictment delay violates an individual's rights to due process of law.

## DISCUSSION
### The Due Process Standard

In *Commonwealth v. Snyder*, 552 Pa. 44, 713 A.2d 596 (1998), this Court held that Article 1, Section 9 of the Constitution of Pennsylvania [10] is coextensive with the due process protections of the United States Constitution.[11] We expressly declined in *Snyder* to hold that the Pennsylvania Constitution provides greater protection than the due process provisions of the United States Constitution, and held that, with respect to claims of violation of due process caused by pre-arrest delay, "our analysis is the same pursuant to both due process clauses." *Id.* at 602. Consequently, we must turn to the standards governing due process claims based on pre-arrest delay promulgated by the United States Supreme Court.

*United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), was the seminal case to address whether a defendant's federal constitutional rights are violated by an extensive delay between the occurrence of a crime and the indictment or arrest of a defendant for the crime. In *Marion*, the defendants were charged with having engaged in a fraudulent business scheme beginning in March of 1965 and ending in January of 1966. The federal prosecutor in *Marion* did not empanel a grand jury to investigate the scheme until Septem-

---

**10.** Known as the Due Process Clause of the Pennsylvania Constitution, this Section provides, in relevant part, "nor can [an accused] be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land." PA CONST. ART. 1, § 9.

**11.** The Due Process Clause of the Fourteenth Amendment provides, "nor shall any State deprive any person of life, liberty, or property, without due process of law...." U.S. CONST AMEND XIV, § 1. The United States Supreme Court decisions that have examined due process claims grounded on pre-arrest delay that arose in federal criminal prosecutions, discussed *infra*, have relied on the Due Process Clause of the Fifth Amendment, which provides, "[n]o person shall ... be deprived of life, liberty, or property, without due process of law...." U.S. CONST. AMEND. V. We analyze Scher's federal constitutional claims pursuant to the Fourteenth Amendment, which is specifically applicable to the Commonwealth's actions. *Cf. Shoemaker v. City of Lock Haven*, 906 F.Supp. 230, 238 (M.D.Pa.1995) ("Rights guaranteed by the Fifth Amendment are not incorporated into the Fourteenth where ... such rights, if they exist, can be asserted directly under the Fourteenth Amendment").

ber of 1969, and no indictment was returned until March of 1970. The defendants moved to dismiss the indictment, claiming: (1) the delay in indicting them violated their Sixth Amendment right to a speedy trial; and, (2) the delay violated their Fifth Amendment right to due process of law. The federal district court granted the defendants' motion and dismissed the indictment. The United States Supreme Court reversed the dismissal, rejecting the defendants' Sixth Amendment speedy trial claims, holding that such protection did not apply until "either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge," which was not implicated in defendants' complaints of pre-arrest delay. *Id.* at 320, 92 S.Ct. 455. Concerning the defendants' Fifth Amendment due process claims, the Court noted that the primary guarantee against the bringing of overly stale charges was whatever statute of limitations applied to the crime.[12] The Court went on to note, however, "the statute of limitations does not fully define the appellees' rights with respect to the events occurring prior to indictment." *Id.* at 324, 92 S.Ct. 455.

The following passage from *Marion* is significant:

Thus, the Government concedes that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused. *Cf. Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Napue v. Ilinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). However, we need not, and could not now, determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution.

*Id.* at 324–25, 92 S.Ct. 455 (footnotes omitted). The Court later stated:

12. There is, however, no limitations period for prosecution of murder in the Commonwealth of Pennsylvania. 42 Pa.C.S. § 5551.

> Nor have appellees adequately demonstrated that the pre-indictment delay by the Government violated the Due Process Clause. No actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them.

*Id.* at 325, 92 S.Ct. 455. The Court concluded its Opinion by stating, "[e]vents at trial may demonstrate actual prejudice, but at the present time appellees' due process claims are speculative and premature." *Id.* at 326, 92 S.Ct. 455.

Six years after *Marion,* the United States Supreme Court revisited the due process implications of pre-arrest delay in *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). Eugene Lovasco was indicted in March of 1975 for possessing firearms stolen from the mail beginning in July and ending in August of 1973. Lovasco moved to dismiss the indictment, claiming that the prosecutor's delay in bringing the indictment caused him prejudice through the deaths of two favorable witnesses and therefore violated his due process rights. The trial court agreed and dismissed the indictment, finding that the seventeen-month delay before the case was presented to the grand jury "had not been explained or justified" and was "unnecessary and unreasonable." *Id.* at 787, 97 S.Ct. 2044. The Eighth Circuit affirmed the dismissal. The United States Supreme Court granted certiorari "to consider the circumstances in which the Constitution requires that an indictment be dismissed because of delay between the commission of an offense and the initiation of prosecution." *Id.* at 784, 97 S.Ct. 2044. The Court discussed the *Marion* decision and rejected Lovasco's argument that if a defendant suffered actual prejudice from the pretrial delay, this was sufficient proof to establish a due process violation: "*Marion* makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *Id.* at 790, 97 S.Ct. 2044. In a later discussion of the "reasons for the delay," the Court stated, "[i]n our view, investigative delay is unlike delay

undertaken by the Government solely 'to gain a tactical advantage over the accused'...." *Id.* at 795, 97 S.Ct. 2044, *citing Marion,* 404 U.S. at 324, 92 S.Ct. 455. Thus, a two-prong test emerged from *Marion* and *Lovasco* to establish a due process claim for pre-arrest delay: (1) the defendant must show actual prejudice from the delay, and (2) prejudice alone is not sufficient to show a violation of due process where the delay was due to the government's continuing investigation of the crime.

From the time *Lovasco* was decided in 1977, the United States Supreme Court has not granted certiorari to discuss in more depth the due process standard as established by *Marion* and *Lovasco,* and has only tangentially discussed the *Marion/Lovasco* standard in cases involving other issues. *See United States v. Gouveia,* 467 U.S. 180, 192, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984) (in a case involving right to appointment of counsel for federal prison inmates who were placed in administrative detention pending indictment for crimes committed in prison, the Court stated, in *dicta,* "the Fifth Amendment requires the dismissal of an indictment, even if it is brought within the statute of limitations, if the defendant can prove that the Government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice"). *See also Arizona v. Youngblood,* 488 U.S. 51, 57, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (in a case concerning whether defendant's due process rights were violated by the police destruction of evidence in the absence of bad faith motives by the police, the Court cited *Marion's* language that "no actual prejudice to the conduct of the defense is alleged and proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them").

All the federal circuits that have examined pre-arrest delay due process claims agree that the *Marion/Lovasco* standard requires that a defendant establish, as a threshold matter, that he or she suffered actual prejudice from the delay. All federal circuits also agree that *Marion* and *Lovasco* require another step for there to be a successful due process claim. There is a

split of authority,[13] however, as to what that next step involves. A majority of the circuits hold that a defendant bears the burden of proving both actual prejudice from the delay and that the delay was "intentionally undertaken by the government for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other impermissible, bad faith purpose." *United States v. Crouch,* 84 F.3d 1497, 1514 (5th Cir.1996). *See, e.g., United States v. Johnson,* 120 F.3d 1107 (10th Cir.1997); *United States v. Rogers,* 118 F.3d 466 (6th Cir.1997); *United States v. Ismaili,* 828 F.2d 153 (3d. Cir.1987), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1110, 99 L.Ed.2d 271 (1988); *United States v. Hoo,* 825 F.2d 667 (2d. Cir.1987), *cert. denied,* 484 U.S. 1035, 108 S.Ct. 742, 98 L.Ed.2d 777 (1988); *United States v. Lebron–Gonzalez,* 816 F.2d 823 (1st Cir.), *cert. denied,* 484 U.S. 843, 108 S.Ct. 135, 98 L.Ed.2d 92 (1987). The Fourth and Seventh Circuits, on the other hand, read the second element of the *Marion/Lovasco* standard differently, and say that it requires a "balancing test" once a defendant can show actual prejudice due to the delay. Pursuant to this scheme, once the defendant proves that he has suffered actual prejudice, the burden shifts to the state to "come forward and provide reasons for the delay." *See, e.g., United States v. Sowa,* 34 F.3d 447 (7th Cir.1994). The Fourth Circuit explicitly rejected the state's argument that only proof of an improper prosecutorial motivation for the delay would be sufficient to establish a violation of due process. *See Howell v. Barker,* 904 F.2d 889 (4th Cir.1990).

Recently, we reviewed the standard for due process claims based on pre-arrest delay in *Commonwealth v. Snyder,* 552 Pa. 44, 713 A.2d 596 (1998). Keith Snyder was charged in 1993 with the murder of his wife and child, who died during a fire at the Snyder home in 1982. The local and state police investigated the deaths for two years, and a special investigat-

---

**13.** Justice White filed a dissenting statement in a case where the Court denied certiorari, in which he recognized the split in the circuits and opined that the Court should have granted certiorari. *United States v. Hoo,* 825 F.2d 667 (2nd Cir.1987), *cert. denied,* 484 U.S. 1035, 108 S.Ct. 742, 98 L.Ed.2d 777 (1988).

ing grand jury was empanelled in 1984, but disbanded in 1986 without returning an indictment. In 1993, a new District Attorney reopened the case and charged Snyder with murder. Snyder filed a motion to dismiss the charges on the grounds that the eleven-year delay between the occurrence of the crime and the indictment caused him actual prejudice and deprived him of his due process rights. The trial court denied the motion, and a jury convicted Snyder of first-degree murder. On appeal, the Superior Court affirmed. We granted allocatur in *Snyder* "to decide whether the extraordinary pre-arrest delay denied the Appellant due process of law." *Id.* at 597.

We concluded that Snyder had suffered actual prejudice from the pre-arrest delay. An autopsy of his wife's body showed that she had consumed a large amount of alcohol at the time of her death. Snyder argued that certain witnesses who had died by the time of his trial had heard statements from his wife that she was contemplating suicide. We determined that the death of witnesses who would have aided Snyder's defense theory that his wife actually set the fire as an act of suicidal depression prejudiced him.

Of particular importance to Scher's case, we then went on to say, "looking to the second prong of the *Marion/Lovasco* test, we must next decide whether the Commonwealth's reasons for postponing the Appellant's arrest were proper." *Id.* at 603. The Commonwealth argued that Snyder could prevail on his claim of deprivation of due process only if he demonstrated that the delay was an intentional ploy designed to give the Commonwealth an advantage at trial. We rejected this argument:

The Appellant does not argue that the prior District Attorneys of Luzerne County intentionally postponed this prosecution to gain a tactical advantage over the Appellant. It appears that the prosecutors, in the exercise of their discretion, decided for reasons that do not appear in the record, that this case lacked prosecutorial merit. Nor is there any basis to conclude that [the current District Attorney] intentionally continued to defer this prosecution for

inappropriate reasons. However, the Appellant asserts that reviving this dormant investigation against him was improper, eleven years after Mrs. Snyder's death, based solely on changed policies of the District Attorney's Office.

Whether done intentionally or not, the Commonwealth gained a tremendous strategical advantage against the Appellant due to the passage of time and the loss of critical defense testimony through death and memory. . . . We hold that, based on all of the facts of this case, bringing this prosecution after more than eleven years caused actual prejudice to the Appellant and deprived him of due process of law unless there were proper reasons for the delay.

*Id.* at 605. We then remanded in order for the Commonwealth to have the opportunity to present the reasons for the delay.[14]

In reviewing Scher's due process claim based on pre-arrest delay, the Superior Court examined the development of the standard in *Marion* and *Lovasco,* and our discussion of that standard in *Snyder. Commonwealth v. Scher,* 732 A.2d 1278 (Pa.Super.1999). The court summarized our interpretation of the *Marion/Lovasco* standard in *Snyder* as requiring an evaluation of: (1) whether the pre-arrest delay resulted in actual prejudice to the appellant, and (2) whether the Commonwealth's reasons for postponing the appellant's arrest were proper. *Scher,* 732 A.2d at 1282. The court opined, however, that we had not, in *Snyder,* "specifically set forth a standard for lower courts to apply in evaluating the propriety of an investigation undertaken by the Commonwealth." *Id.* at 1283. After concluding that "our case law reveals no other standard," the court relied on a Ninth Circuit opinion, *United States v. Mays,* 549 F.2d 670 (9th Cir.1977), to provide the second element of the due process standard. In particular, the court cited the balancing test adopted in *Mays* as being

14. As will be discussed in more detail *infra,* the trial court affirmed Snyder's murder conviction on remand, which the Superior Court affirmed in an *en banc* opinion. *Commonwealth v. Snyder,* 761 A.2d 584 (Pa.Super.2000).

most consistent with the due process principles articulated in *Marion* and *Lovasco*:

> [T]he standard to be used [in a due process claim for pre-indictment delay] has to do with where the fulcrum for the balancing test is to be placed. In *Marion*, the Court states that the presence of actual prejudice resulting from pre-indictment delay would not by itself warrant the dismissal of a criminal prosecution. The greater the length of the delay and the more substantial the actual prejudice to the defendant becomes, the greater the reasonableness and the necessity for the delay will have to be to balance out the prejudice. However, despite the degree of actual prejudice, for a judgment in favor of dismissal, there must be some culpability on the government's part either in the form of intentional misconduct or negligence.

*Scher*, 732 A.2d at 1284, (quoting *Mays*, 549 F.2d at 678) (emphasis omitted). Based on this standard, the Superior Court concluded:

> [W]here there has been an excessive and prejudicial pre-arrest delay, we will not only inquire as to whether there has been any intentional delay by the prosecution to gain a tactical advantage over the accused, but we will also consider whether the prosecution has been negligent by failing to pursue a reasonably diligent criminal investigation.

*Id.* It is this determination by the Superior Court—that mere negligence in the investigation of a crime constitutes an improper purpose for pre-arrest delay—that we must consider presently.

As we made apparent from our previously-cited language in *Snyder*, we do not follow the view subscribed to by the majority of the federal circuits that a defendant can prevail on a due process claim based on pre-arrest delay *only* where he or she proves actual prejudice *and* that the delay was an intentional device employed by the prosecutor to gain a tactical advantage over the accused. We agree with the court below in its reading of *Marion* and *Lovasco* that delay intentionally undertaken by the prosecution to gain a tactical

advantage over the defendant is one case, but not the only case, where pre-arrest delay would violate due process.

However, in requiring, as we did in *Snyder*, an examination of the reasons for the delay, we did not intend to create an obligation on the Commonwealth to conduct all criminal investigations pursuant to a due diligence or negligence standard, measured from the moment when criminal charges are filed and the defendant raises his due process claim. Such a standard would be too onerous, requiring judicial oversight of decisions traditionally entrusted to the prosecutor. Furthermore, a due diligence or negligence standard would require an inquiry into the methods, resources, and techniques of law enforcement in conducting a criminal investigation that would amount to judicial second-guessing of how the Commonwealth must build its case. We are mindful of the Supreme Court's admonition in *Lovasco* against placing too stringent a responsibility on the prosecution to justify the delay in the face of these claims:

> [T]he Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Judges are not free, in defining "due process," to impose on law enforcement officials our "personal and private notions" of fairness and to "disregard the limits that bind judges in their judicial function." *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Our task is more circumscribed.

*Lovasco*, 431 U.S. at 790, 97 S.Ct. 2044.

Indeed, the disposition of the *Snyder* case following our remand order illustrates the flaw in the Superior Court's adoption of a negligence standard in *Scher*. Pursuant to our remand order in *Snyder*, the trial court conducted two days of hearings to ascertain the propriety of the Commonwealth's reasons for charging Snyder eleven years after the crime occurred. *Snyder*, 761 A.2d at 586. The Commonwealth presented the testimony of previous Luzerne County District Attorneys as to the status of the investigation when they held office, and what steps were taken to advance the investigation.

At the close of these hearings, the trial court concluded that the prosecutor's delay in filing charges was not improper and affirmed Snyder's murder conviction. An *en banc* Superior Court affirmed. The court agreed with the trial court that the Luzerne County District Attorneys had not acted improperly and that their actions did not deprive Snyder of his right to due process of law. Notably, the court summarized the reasons why due process principles do not require a judicially-imposed due diligence or negligence standard for oversight of a criminal investigation:

> From our review of the precedents … it is clear that in assessing the performance of prosecutors as to delay in initiating charges, there is a distinct characteristic of hesitancy to critically evaluate the day-to-day decision making of the office of the prosecutor. This, undoubtedly, stems from a recognition that the prosecutor must face a stream of current cases which demand immediate attention and are subject to intense public scrutiny; that the office typically has limited resources which must react to legislative, judicial, media and public demands for priority in addressing an ever-changing array of social problems....
>
> It should not offend constitutional standards even if it may be said that a given case has undergone a period of informed deferral or perhaps even benign neglect.

*Id.* at 589 (footnote omitted). Recognizing that a panel of that court in *Scher* had applied a standard that "by its terms, implicates both a negligence and due diligence concept in the judicial evaluation of the prosecutor's performance," the *en banc* court in *Snyder* specifically refused to follow that standard. *Id.* at 590. The court stated, "[t]he *Scher* decision was filed after the hearing and order on remand in the instant matter and we have elected not to follow the 'due diligence' and negligence standards adopted therein. As a court *en banc,* we are not bound to follow a superior court panel opinion." *Id.* (citations omitted).

We agree with this rationale that negligence or due diligence in the conduct of a criminal investigation is not the appropriate standard for deciding whether delay in indictment

deprives a defendant of due process. As a result, the test that we believe is the correct one must take into consideration all of the facts and circumstances surrounding the case, including: the deference that courts must afford to the prosecutor's conclusions that a case is not ripe for prosecution; the limited resources available to law enforcement agencies when conducting a criminal investigation; the prosecutor's motives in delaying indictment, and; the degree to which the defendant's own actions contributed to the delay. Therefore, to clarify the standard established in *Snyder*, we hold that in order to prevail on a due process claim based on pre-arrest delay, the defendant must first show that the delay caused him actual prejudice, that is, substantially impaired his or her ability to defend against the charges. The court must then examine all of the circumstances to determine the validity of the Commonwealth's reasons for the delay. Only in situations where the evidence shows that the delay was the product of intentional, bad faith, or reckless [15] conduct by the prosecution, however, will we find a violation of due process. Negligence in the

**15.** We borrow this concept that due process claims based on pre-arrest delay must show more than mere negligence in the conduct of a criminal investigation from federal caselaw concerning federal civil rights lawsuits brought pursuant to 42 U.S.C.A. § 1983, which allege a violation of the Due Process Clause of the Fourteenth Amendment. Plaintiffs who raise those claims must show more than ordinary negligence on the part of state actors in order to recover in a Section 1983 lawsuit where they claim a violation of either substantive or procedural due process. *See Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662 (1986) ("Due Process Clause is simply not implicated by the negligent act of an official causing unintended loss of or injury to life, liberty, or property"). *See also County of Sacramento v. Lewis*, 523 U.S. 833, 836, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (in a Section 1983 suit arising from a collision during high-speed chase by police, "only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation"). While we do not follow those circuits that recognize a pre-arrest due process claim *only* when the defendant shows that the prosecution intentionally delayed indictment or arrest in order to gain a tactical advantage at trial over the defendant, nevertheless we believe that the standard we adopt here, requiring a showing that the Commonwealth acted intentionally, in bad faith or recklessly in delaying indictment, accommodates the principle that due process violations based on pre-arrest delay will only occur in the rarest cases where the Commonwealth's conduct shocks the conscience and offends one's sense of justice.

conduct of a criminal investigation, without more, will not be sufficient to prevail on a due process claim based on pre-arrest delay. With this clarification of the standard in mind, we turn to Scher's case.

## Actual Prejudice

The threshold question we must address whenever a defendant raises a due process claim due to pre-arrest delay is whether the defendant suffered actual prejudice from the delay. *See, e.g., Commonwealth v. Sneed,* 514 Pa. 597, 526 A.2d 749, 752 (1987). We have not elucidated the meaning of "actual prejudice"; however, numerous federal appellate courts have refined the concept. In order for a defendant to show actual prejudice, he or she must show that he or she was meaningfully impaired in his or her ability to defend against the state's charges to such an extent that the disposition of the criminal proceedings was likely affected. *Jones v. Angelone,* 94 F.3d 900, 907 (4th Cir.1996). This kind of prejudice is commonly demonstrated by the loss of documentary evidence or the unavailability of an essential witness. *United States v. Cornielle,* 171 F.3d 748, 752 (2d. Cir.1999). It is not sufficient for a defendant to make speculative or conclusory claims of possible prejudice as a result of the passage of time. *United States v. Sturdy,* 207 F.3d 448, 452 (8th Cir.2000). Where a defendant claims prejudice through the absence of witnesses, he or she must show in what specific manner missing witnesses would have aided the defense. *United States v. Trammell,* 133 F.3d 1343, 1351 (10th Cir.1998). *See also Sneed,* 526 A.2d at 752 (defendant failed to show prejudice from unavailability of witnesses because he failed to show how witnesses' testimony would have tended to exculpate him). Furthermore, it is the defendant's burden to show that the lost testimony or information is not available through other means. *United States v. Rogers,* 118 F.3d 466, 475 (6th Cir.1997).

Scher claims that he suffered prejudice because certain witnesses died and important evidence was lost by the time of trial that would have aided his defense that the shooting of Dillon was accidental, not intentional. Specifically, he points

to the deaths of four witnesses: Dr. Grace, Coroner Conarton, Detective Collier and Trooper Salinkas. Scher also claims prejudice from the decomposition of Dillon's body that occurred during the twenty-year period, and from the Commonwealth's conduct of the second autopsy in 1995, which he claims interfered with his ability to present expert testimony in support of his position that Dillon's death was accidental. Further, Scher argues that the loss or destruction of other evidence, such as: the ejector mechanism from the sixteen-gauge shotgun; the audio recording of the June 1976 autopsy; certain photographs taken of the scene; the unused shotgun ammunition, and; any bloodstains on the inside of the shotgun, impaired his ability to show that the shooting was accidental and not a premeditated act of murder.

In order to argue prejudice from the loss or destruction of evidence in these due process claims, the defendant must show that the loss or destruction of evidence related to the delay in filing charges. With respect to some of the items that Scher claims were lost or destroyed, the delay in filing charges clearly had no role in causing these items to be lost or destroyed. First, Scher contends that by the time charges were filed against him, the shotgun had been fired numerous times, thus eliminating any bloodstains that may have been inside the barrel, which would have tended to prove a close range of fire consistent with Scher's story that the shooting was an accident. However, one of Scher's experts, George Fassnacht, a forensic firearms consultant, testified that the repeated firing of the shotgun in 1976 by the police during testing of the weapon would have removed any bloodstains from inside the barrel. Accordingly, the loss of this evidence cannot be attributed to the delay in indicting Scher for murder, as the bloodstains would have been eliminated and hence unavailable for his defense even if the Commonwealth had filed charges in 1976. Additionally, Scher asserts that the fact that Dillon's body was washed and embalmed before the June 3, 1976 autopsy prejudiced him because it affected his ability to determine whether there was any gunpowder residue on the skin around the wound that would have indicated the

range of fire. This claim of prejudice also fails because the loss of this evidence cannot be attributed to the delay in indicting Scher. Indeed, Dillon's body had been washed and embalmed within a day of his death, and, therefore, would have been in this condition even if the Commonwealth had filed charges immediately. Finally, Scher points to the investigators' failure to preserve the unused ammunition from the scene and claims prejudice because the type of ammunition that was present but unused could have supported his claim of accident and negated the Commonwealth's position that the killing was intentional.[16] The Commonwealth, however, never collected the unused ammunition from the scene, which, therefore, would not have been available to Scher regardless of the delay in filing charges. Consequently, Scher cannot rely on the loss of evidence in these instances to support his claim that the pre-indictment delay prejudiced him.[17]

Scher also claims prejudice from the loss of evidence that occurred sometime during the twenty-year delay, specifically, the ejector mechanism from the sixteen-gauge shotgun and photographs of Dillon's body taken at the scene that were in Detective Collier's custody.

█ Scher offered the testimony of George Fassnacht to show that, based on certain characteristics of the shotgun, an accidental discharge of the weapon during a struggle was

**16.** The type of shell that killed Dillon was a number four load high brass magnum shell. The Commonwealth argued that this kind of shell would not be used in skeet or trap shooting and that its presence in the sixteen-gauge shotgun evidenced the intent of Scher to murder Dillon. Scher contends that they had a mix of ammunition with them and bought whatever was on sale, and therefore the presence of other number four shells in the unused ammunition would have shown that there was nothing unusual for him and Dillon to utilize number four shells for skeet or trap shooting.

**17.** These claims more properly relate to a due process claim based on police failure to preserve evidence. The United States Supreme Court has made clear, however, that the police do not violate a defendant's due process rights by failing to preserve potentially useful evidence unless the defendant can show that the police acted in bad faith. *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). There has been no showing of bad faith on the part of the police with respect to the loss of evidence in these instances.

possible. With respect to the ejector mechanism from the shotgun, Fassnacht testified that a police report concerning the weapon prepared in 1976 contained no notation that the ejector mechanism was missing at that time. However, a police report prepared in April of 1996 noted that the ejector was missing, which Fassnacht testified would only occur if the gun had been disassembled and the ejector removed. Fassnacht testified on direct examination that the ejector mechanism allows the weapon to be fired in a "normal manner" and that its subsequent absence showed that it was not in its original condition when the police tested it in 1996. On cross-examination, however, Fassnacht conceded that the ejector mechanism does not affect the firing of the gun. Indeed, in response to the question, "So the ejector tore [sic] really has nothing to do with whether or not the gun will go off by pulling the trigger or otherwise, does it?", Fassnacht answered, "That's correct." Because Scher's expert admitted that the absence of the ejector mechanism has no bearing on whether the gun would discharge accidentally, his claim of prejudice from the loss of this evidence cannot be sustained.[18]

During the initial investigation of Dillon's death, Detective Collier apparently obtained Polaroid photographs of Dillon's body that were taken by the Pennsylvania game commissioner who was one of the first individuals at the scene. When the authorities reactivated the investigation at the urging of the Dillon family, Mr. Dillon requested that the investigators

18. Moreover, the only connection Fassnacht ever made between the absence of the ejector mechanism and a determination of whether the gun could discharge accidentally was when he testified that "I don't know that the process used to remove the ejector didn't dislodge any detritus which may cause a shock or drop failure of the mechanism." N.T. 10/9/97 p. 27. Fassnacht explained that he observed grease and dirt inside the weapon that would have also been present in 1976, which could have been responsible for an accidental firing, but that he was unable to get the weapon to discharge without pulling the trigger when he tested it in 1997. Nevertheless, despite the absence of the ejector mechanism and the inability to duplicate an accidental firing when he tested the weapon in 1997, Fassnacht opined that, to a reasonable degree of scientific certainty based on his examination of the weapon, the shotgun could have fired accidentally during a struggle between Dillon and Scher. Id. p. 20.

obtain those photographs and review them. The state police investigators contacted Detective Collier's widow, but were unable to locate the photographs and concluded that they had been destroyed. Scher now claims that the destruction of these photographs deprived him of potentially exculpatory evidence, and therefore prejudiced him.

As we stated earlier, a claim of prejudice based on loss of evidence must show that the lost testimony or information is not available through other means. *See United States v. Rogers*, 118 F.3d 466, 475 (6th Cir.1997). Here, the lost photographs were not the only photographs of Dillon's body as it appeared at Gunsmoke. Trooper Zanin had taken numerous photographs of Dillon's body at the scene, which were introduced at trial and had been reviewed by Scher's experts prior to their testimony.[19] Scher fails to explain what would have appeared in the Polaroid photographs that could not be seen in the photographs taken by Trooper Zanin in his documentation of the scene. His claim of prejudice is entirely speculative and is without support in light of the other photographic evidence that was available to him.

Scher claims prejudice from the deaths of three witnesses involved in the initial investigation of Dillon's death: Trooper Salinkas, Detective Collier, and Coroner Conarton. We have previously noted that a defendant who claims prejudice through the absence of witnesses must show in what specific manner the missing witnesses would have aided the defense. *See United States v. Trammell*, 133 F.3d 1343, 1351 (10th Cir.1998). Scher argues that Trooper Salinkas and Detective Collier would have provided exculpatory testimony because they viewed the evidence close in time to Dillon's death and did not pursue charges against Scher. With respect to Trooper Salinkas, Scher's argument is pure speculation: he does not know how Trooper Salinkas would have testified if he were alive at the time of trial and offers no instance of exculpatory information that Trooper Salinkas possessed to the exclusion

19. John Shane, M.D., a pathologist who testified on Scher's behalf, identified twenty-seven black-and-white photographs of Dillon taken at the scene that he had reviewed. N.T. 10/9/97, p. 108.

of other witnesses. Regarding Detective Collier, to the extent that we can glean his views from his June 9, 1976 report introduced by Scher at the pretrial hearing,[20] Scher's claim that he would have provided exculpatory testimony has no support in the record. Indeed, Detective Collier's report, and the testimony at the pretrial hearing from Collier's contemporaries, demonstrate that Collier suspected Scher of having committed murder, and therefore would not have provided testimony favorable to Scher.[21]

It is, however, Scher's claim of prejudice from the death of Coroner Conarton that illustrates the flaw in his argument regarding the potentially exculpatory testimony of these investigating officers. At trial, Scher's defense was that the shooting occurred accidentally. His claim of prejudice from the deaths of Collier, Salinkas, and Conarton is based on the assumption that because these individuals never pressed for the filing of murder charges against Scher, they must have agreed that Dillon's death was an accident. Specifically with regards to Coroner Conarton, Scher notes that Dillon's death certificate, completed by Conarton, lists the cause of Dillon's death as accidental. Scher contends that he was prejudiced when he lost the opportunity to have Conarton explain why he believed Dillon's death was accidental. What Scher ignores, however, is that in the section of the death certificate that asks, "How did injury occur?", Coroner Conarton wrote, "Running with gun, fell, gun went off." As Scher admitted in his trial testimony, this is not how Dillon died, and his stories to Conarton, Collier, and the other investigating officers to this effect were lies. Conarton was present when Scher gave his statement to Trooper Hairston at the scene, which related the

20. *See* n. 4, *supra.*

21. As an instance of Collier's potential usefulness as a witness, Scher points to the Polaroid photographs allegedly in Collier's possession that were never recovered. Scher claims Collier could have either produced the photographs or described what they showed. We have previously held, however, that the absence of those photographs cannot support Scher's claims of prejudice in light of the numerous other photographs of Dillon's body taken at the scene that were relied on by Scher's experts. Consequently, we will not find prejudice from the loss of Collier's testimony regarding these photographs.

false story of how Dillon tripped while running with the shotgun. The record strongly suggests that Conarton formed his opinion as to the cause of Dillon's death based mainly on Scher's false statement and a cursory review of the scene where Dillon's body lay positioned in a manner, with shoelaces untied, that Scher deliberately set to make it appear that Dillon tripped and fell while carrying the shotgun.[22] When Scher finally testified that the shooting did not occur from Dillon tripping and falling, as he had repeatedly told the investigators and the public, he substantially undermined the importance of any investigatory conclusions that relied on this false scenario. Consequently, we cannot credit Scher's complaints of prejudice from the absence of Conarton's testimony to explain why he concluded that Dillon's death was accidental, when it is apparent that Conarton accepted a version of the "accident" that Scher himself admitted was false and upon which he did not base his defense.

▮▮▮▮ The most serious claim of prejudice raised by Scher concerns the death of Dr. Grace and the loss of audio recordings from the June 3, 1976 autopsy performed by Dr. Grace, as well as the alteration of Dillon's body during the second autopsy in 1995. The critical issue to Scher's defense was whether the physical evidence was consistent with an accidental discharge of the weapon during a struggle. Evidence of the angle of Dillon's chest wound, the presence or absence of "scalloping"[23], the presence or absence of gunpowder around

22. The Superior Court below stated, "[w]e will ... never know why Conarton believed Dillon's death to be accidental." *Scher*, 732 A.2d at 1286. While it is true that we will never have absolute proof of why Conarton believed Dillon's death was accidental, there is ample evidence in the record, in addition to the above-referenced notation on Dillon's death certificate, that Conarton accepted Scher's false version of events very early on in the investigation. Trooper Hairston testified that Coroner Conarton had expressed to him the opinion that the shooting was an accident right after Scher had given his statement, within minutes of inspecting the scene. N.T. 9/25/97, pp. 18–19. Edward Little testified that Coroner Conarton was "hellbent that this was accidental," and that he had to intervene with Conarton to delay issuance of the death certificate, which occurred within 10 days of Dillon's death.

23. According to Dr. Cyril Wecht, a forensic pathologist who testified for Scher, "scalloping" is "a kind of a continuously curled contour from

the wound, and the size of the wound were relevant to the determination of whether Dillon was shot from a close range, consistent with a struggle, or a more distant range that could not have been caused by an accidental discharge during a struggle.

In support of his defense theory, Scher presented a number of expert witnesses. John Shane, M.D., a pathologist, reviewed, among other evidentiary items: twenty-seven black and white photographs of the scene; the clothes worn by Dillon, the photographs taken during Dr. Grace's autopsy; photographs taken during the second autopsy in 1995; forty-three microscopic slides of tissue taken from Dillon's body; Dr. Grace's autopsy report; and the shot cup retrieved from Dillon's body. Dr. Shane observed that Dr. Grace did not note scalloping around the margins of Dillon's chest wound in his June 3, 1976 autopsy report, and that his own review of the photographs from that autopsy indicated no scalloping. Based on his review of the autopsy photographs and Dr. Grace's report, Dr. Shane opined, to a reasonable degree of medical certainty, that there was no scalloping around the margins of Dillon's chest wound and that this indicated a close range of discharge—within twelve inches. Dr. Shane also noted that the June 3, 1976 autopsy report showed "what was apparently powder burns" in the wound tract, and his examination of the slides from the 1995 autopsy indicated the presence of carbon that Dr. Shane identified as gunpowder residue. Dr. Shane testified that the presence of gunpowder residue in the wound tract signaled that the range of fire would have been within eighteen inches, due to the limited distance that gunpowder travels from the barrel when a firearm is discharged. Finally, at the close of direct examination, Scher's counsel asked Dr. Shane the following:

> the mollusk of the scallop where the shell, instead of just a line may not be straight, may be curvy, linear but it has a continuous non-indented line. Scalloping ... is an indentation usually of fairly uniform nature." N.T. 10/14/97 p. 105. The presence of scalloping is useful in determining range of shotgun fire, according to Dr. Wecht, because "as the shotgun blast moves further back then the pellets are beginning to disburse a little bit. Then you will begin to get some irregular contouring of the edges of the wound." *Id.* p. 106.

322

Q: Doctor, based on your review of the various reports that you have identified for the jury, your examination of the physical evidence in this case, the analysis you have conducted, do you have an opinion to a reasonable degree of medical certainty as to the distance between muzzle and skin in this case?

A: I do.

* * *

Q: What is your opinion?

A: My opinion is that the distance of the muzzle from the skin surface was 12 inches or less.

N.T. 10/10/97 p. 67.

Scher also presented the testimony of Cyril Wecht, M.D., a forensic pathologist and the Coroner of Allegheny County. Dr. Wecht reviewed, among other items: Dr. Grace's autopsy report; the report from the 1995 autopsy; Dillon's clothing; 873 photographs produced by the Commonwealth; various expert reports; and tissue samples obtained from Dillon's body. Dr. Wecht concluded that, based on his examination of the autopsy photographs and the absence of any notation of scalloping in Dr. Grace's autopsy report, there was no scalloping around the edges of Dillon's chest wound, which indicated that the shotgun was fired at close range. Based on his examination of the slides prepared from tissue extracted from Dillon's body, Dr. Wecht concluded that gunpowder residue was present in Dillon's chest wound. Concerning whether the physical evidence was inconsistent with an accidental discharge during a struggle, Dr. Wecht opined that there was no evidence that was inconsistent with that scenario, and that, to a reasonable degree of medical certainty, the range of fire was less than one foot. Towards the close of direct examination, Scher's counsel elicited the following opinion:

Q: Now, Dr. Wecht, do you have an opinion to a—based on your review of all of the physical evidence and your review of the reports and your review of the slides and photographs, do you have an opinion to a degree of reasonable

medical certainty as to whether or not the wound caused in this case is consistent with a struggle?

A: Yes, I have an opinion.

Q: What is that opinion?

\* \* \*

A: Yes, in my opinion, with a reasonable degree of medical certainty, the findings in this case which we have talked about would be entirely consistent with a struggle and the accidental discharge of the weapon.

N.T. 10/14/97 p. 116.

Another forensic pathologist, Michael Baden, M.D., testified for the defense. Dr. Baden reviewed, among other items: the autopsy report of Dr. Grace; the death certificate of Dillon; the photographs of Dillon's body at the scene and at the initial autopsy; various police and laboratory reports; and slides prepared from samples extracted during the second autopsy. Dr. Baden testified that carbonaceous material present in the slides prepared from tissue extracted from the wound tract indicated the presence of gunpowder. Further, Dr. Baden reviewed the photographs from the scene and the initial autopsy and concluded, as had Drs. Shane and Wecht, that there was no scalloping present on the margin of the gunshot wound. Similar to Drs. Shane and Wecht, Dr. Baden opined that the distance between the muzzle of the shotgun and the skin was within a few inches, up to one foot. At the close of his direct examination, Dr. Shane testified, to a reasonable degree of medical certainty, that the physical evidence "was entirely consistent with there being a struggle," and that there was "no scientific evidence that is inconsistent with a struggle."

 The ability of Scher's experts to support his defense by offering opinions to a reasonable degree of medical certainty based on a review of the evidence available to them demonstrates why Scher's claims of prejudice fail. He has not shown that he was meaningfully impaired in his ability to defend against the charges to such an extent that the disposition of the proceedings was likely affected. *See Jones v.*

*Angelone,* 94 F.3d 900, 907 (4th Cir.1996). Despite the absence of Dr. Grace's direct testimony concerning his observations from the autopsy and the audio tapes of that autopsy, there was sufficient evidence, including photographs and Dr. Grace's report, for Scher's experts to offer specific opinions concerning the presence of gunpowder in the wound tract, the range of fire, and whether the physical evidence was consistent with a struggle.[24] Further, Scher claims prejudice from the removal of the "wound of entry" from Dillon's chest during the 1995 autopsy performed by Dr. Mihalakis, who later testified as an expert for the Commonwealth, which Scher's experts were unable to examine when they (Dr. Baden, Dr. Shane, and Dr. Wecht) performed a third autopsy in 1996. Scher's experts, however, utilized the slides prepared by Dr. Mihalakis from tissue removed during the 1995 autopsy in forming their opinions regarding the presence of carbonaceous material in the wound tract. In the pretrial hearings, Dr. Wecht conceded that he had given opinions in other cases where he was unable to do the autopsy personally or directly observe the body and therefore relied on "reports, photographs, microscopic slides, crime lab reports, [and] investigative reports by police" in forming his conclusions. We find, therefore, that Scher did not suffer actual prejudice due to the death of Dr. Grace, the loss of audio tapes from the first autopsy, and the extraction of the wound of entry during the 1995 autopsy, where the remaining evidence was of sufficient quality to enable three highly-qualified pathologists to offer

**24.** As an example of how Dr. Grace's testimony would have been helpful to his case, Scher relies on the testimony of his experts, who stated that some conclusions, such as whether gunpowder is present and whether there is scalloping along the edges of the wound, are best made by the individual who first examined the body—in this case, Dr. Grace. However, Scher used the fact that Dr. Grace's report indicated the presence of gunpowder in the wound tract and did not note scalloping along the margins of the wound to his advantage, which left the burden on the Commonwealth to explain the inconsistencies between Dr. Grace's conclusions and its position that Scher murdered Dillon. Moreover, it is far from certain that Dr. Grace would have testified in support of Scher's theory of an accidental shooting. A police report of an October 10, 1994 interview indicated that Grace had formed no opinion as to whether the manner of Dillon's death was homicide, suicide, or accidental. N.T. 10/15/97 pp. 108–09.

expert testimony on specific matters in dispute and to render opinions to a reasonable degree of medical certainty that the physical evidence was consistent with an accidental, close-range discharge during a struggle.

Finally, Scher argues prejudice due to the faded memories of witnesses and his supposed inability to present a psychological profile of Dillon. Preliminarily, we note that the difficulty of witnesses to recall precisely what happened years ago is likely to be present in any murder case where charges are filed many years after the crime occurred. Our legislature, however, has chosen to place no statute of limitations on murder prosecutions and has made a policy determination that punishment of the most serious crime should outweigh the difficulties otherwise incurred in the prosecution of "stale" charges. A defendant who claims actual prejudice from the faded memories of witnesses, therefore, must show in concrete terms how the loss of memory has deprived him or her of the ability to defend against the charges; general allegations of prejudice are not sufficient. Here, Scher offers only one specific example of the faded memory of a witness to sustain this claim of prejudice: the testimony of Jocelyn Richards.[25] Richards testified that, during a conversation at the hospital where they worked together prior to Dillon's death, Scher had told her that "if he wanted something, he would get it one way or another." In his testimony, Scher contracted this, denying that he ever made such a statement. Contrary to Scher's claim, this is not an instance of a witness' memory fading. Richards recalled Scher making this statement and so testified—Scher simply disputes that he said it. Hence, this claim of prejudice fails. At the pretrial hearings, Scher proffered the testimony of Richard Fischbein, M.D., who explained that he was unable to offer an opinion as to Dillon's psychological state at the time of his death because the passage of time made it impossible for him to obtain the necessary data. When asked to make an offer of proof concerning the relevance of a psychological autopsy[26], Scher's counsel explained

25. *See* Appellee's Brief, pp. 46–47.

26. According to Dr. Fischbein, a "psychological autopsy" is:

that "[t]here is the possibility that this victim may have committed suicide. I believe it goes . . . to that issue." N.T. 7/18/97 p. 175. This testimony, of course, took place before the trial testimony of Scher, when the fabricated story of Dillon shooting himself while running with the shotgun was still at issue. The admission by Scher that Dillon was shot while the two engaged in a struggle with the weapon eliminated whatever marginal relevance the opinions of Dr. Fischbein would have had regarding potential suicidal tendencies by Dillon.

We hold that Scher has failed to establish that he suffered actual prejudice as a result of the delay.

### Reasons for the Delay

Although we have concluded that Scher has not met the burden of demonstrating actual prejudice due to the delay in indictment, and could end our analysis there, we nevertheless feel compelled to examine the reasons for the delay in this case to illustrate why the Commonwealth has not violated Scher's right to due process of law pursuant to the principles developed in this opinion. We have stated that, in order for there to be a violation of due process, the Commonwealth's behavior must be more than merely negligent in causing the delay. Only where the Commonwealth has intentionally delayed in order to gain a tactical advantage or acted recklessly to such a degree as to shock one's conscience and offend one's sense of justice will we find a deprivation of due process. We do not find the Commonwealth's behavior in this case to be so outrageous as to meet that standard. There has been no allegation that the Commonwealth intentionally delayed indicting Scher in order to gain a tactical advantage over him, and the record contains credible denials from a succession of

[A] method whereby, after the death of an individual, by looking at previous medical history, looking at the facts of the individual, where they were found, talking to family members, talking to other loved ones . . . we are trying to reconstruct the mind set of that individual and asking questions that may disclose risk factors that could be associated with accidental death, other risk factors that may be associated with suicide.
N.T. 7/18/97 pp. 23–24.

Susquehanna County District Attorneys that they ever intentionally employed delay tactics. Furthermore, we cannot accept the Superior Court's conclusion that the Commonwealth's actions were "grossly negligent." Astonishingly, the Superior Court's opinion makes no mention of the watershed moment in this case: when Scher admitted that he had lied to investigators about how Dillon's death occurred and that, for the past twenty years, he lied when he denied having had an affair with Patricia prior to the incident at Gunsmoke. Rather than exercise his constitutional right to say nothing, which would, in all likelihood, have heightened the suspicion against him and possibly resulted in an investigation that would have resulted in immediate charges, he instead staged the scene and fabricated a story that gained some credence with investigators. Perhaps, as Scher argues, those investigators should have been more circumspect in accepting his tale and pursued their suspicions more thoroughly, but we cannot find the Commonwealth's actions towards Scher so egregious when, in a small town, in a rural part of Pennsylvania with a part-time District Attorney, those responsible for enforcing the law would find it difficult to disbelieve the word of a respected physician. Nor can we ignore the benefit that Scher gained by lying to authorities rather than remaining silent: he enjoyed his liberty for twenty years. In these circumstances, we cannot find that the Commonwealth's failure to charge Scher with murder sooner violated his right to due process of law.

## CONCLUSION

We reverse the Order of the Superior Court and remand to the Superior Court for the consideration of Scher's remaining appellate issues. Jurisdiction relinquished.

Former Chief Justice FLAHERTY did not participate in the decision of this case.

Justices CASTILLE, NIGRO, and SAYLOR, file a Concurring Opinion.

Chief Justice ZAPPALA files a Dissenting Opinion in which Justice CAPPY joins.

Justice CASTILLE, concurring.

I join in that portion of the Opinion Announcing the Judgment of the Court which holds that appellee failed to show that he suffered actual prejudice from the pre-arrest delay in this case. Proof of actual prejudice, of course, is an indispensable element of any claim that a delay in initiating prosecution violated due process. *See United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *Commonwealth v. Snyder*, 552 Pa. 44, 713 A.2d 596 (1998); *Commonwealth v. Daniels*, 480 Pa. 340, 390 A.2d 172 (1978).

I recognize that, in his Concurring Opinion, Mr. Justice Saylor draws a distinction between "actual" prejudice and "substantial" prejudice, and opines that both are necessary to establish the prejudice prong of the *Marion/Lovasco* test. Justice Saylor then concludes that, although appellee proved actual prejudice here, he did not prove substantial prejudice. It appears that the federal courts, beginning with *Marion* itself, have adverted to both "actual" and "substantial" prejudice, without it being entirely clear that the Supreme Court, or a majority of the Circuit Courts of Appeal, intend such a distinct two-pronged approach to the prejudice question. *Compare Marion*, 404 U.S. at 324–26, 92 S.Ct. 455 (referring first to "substantial prejudice" but thereafter only to "actual prejudice") *with Lovasco*, 431 U.S. at 789, 97 S.Ct. 2044 (citing only *Marion's* "actual prejudice" test). *See also Acha v. United States*, 910 F.2d 28, 32 (1st Cir.1990) (employing "actual" prejudice test; proof must be definite and not speculative) (citations omitted); *United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir.1999) (using terms "actual" and "substantial" prejudice interchangeably; defining prejudice as "that sort of deprivation that impairs a defendant's right to a fair trial"); *United States v. Fulford*, 825 F.2d 3, 9 (3d Cir.1987) ("actual" prejudice); *United States v. Mmahat*, 106 F.3d 89, 94–95 (5th Cir.1997) ("actual, substantial" prejudice); *United States v. Rogers*, 118 F.3d 466, 475–76 (6th Cir.1997) (using terms "actual," "substantial," and "actual substantial" prejudice interchangeably); *United States v. McMutuary*, 217 F.3d 477,

481–82 (7th Cir.2000) ("A defendant's burden to show actual and substantial prejudice is an exacting one; the show must rest upon more than mere speculative harm"); *United States v. Edwards,* 159 F.3d 1117, 1128 (8th Cir.1998) ("actually, substantially prejudiced"); *United States v. Doe,* 149 F.3d 945, 948 (9th Cir.1998) ("actual, non-speculative prejudice"); *United States v. Wood,* 207 F.3d 1222, 1235 (10th Cir.2000) ("actual" prejudice); *United States v. Foxman,* 87 F.3d 1220, 1223 (11th Cir.1996) ("actual substantial" prejudice). It appears that only one Circuit specifically approaches the question in a dual fashion, requiring proof of both actual and substantial prejudice. *See Jones v. Angelone,* 94 F.3d 900, 907 (4th Cir.1996) (holding that "a defendant [must not only] show actual prejudice, as opposed to mere speculative prejudice, . . . but also ... any actual prejudice was *substantial*—that he was meaningfully impaired in his ability to defend against the state's charges to such an extent that the disposition of the criminal proceeding was likely affected"). The U.S. Supreme Court has not directly addressed the question since *Lovasco.*

I have no quarrel with the *Angelone* distinction as cogently formulated and applied by Mr. Justice Saylor here. I nevertheless join the lead opinion on this question because: (1) our majority opinion in *Snyder* followed an actual prejudice approach, 713 A.2d at 601; (2) whether the Fourth Circuit's *Angelone* formulation is viewed as a matter of nomenclature or constitutional nuance, I am satisfied, based upon the lead opinion's thorough review, that appellee failed to prove *Marion/Lovasco* prejudice; and (3) the narrowest ground of decision here is the absence of prejudice and I believe it is important to attempt to decide cases by clear majority opinion whenever possible, and particularly when a case is heard upon discretionary appeal. *See U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, —— – ——, 122 S.Ct. 1516, 1526–27, 152 L.Ed.2d 589 (2002) (O'Connor, J., concurring).

Although the absence of prejudice alone is enough to decide this appeal, the lead opinion also addresses the second prong of the *Marion/Lovasco* due process test, which requires consideration of "the reasons for the delay." *Lovasco,* 431 U.S. at

790, 97 S.Ct. 2044. The lead opinion's inquiry into this question is appropriate, in my view, given this Court's supervisory role. The Superior Court panel opinion is published, and that panel adopted a super-minority approach to the evaluation of the reasons for pre-arrest delay, based upon a quarter-century-old opinion from the Ninth Circuit, *United States v. Mays,* 549 F.2d at 679 (9th Cir.1977), decided before *Lovasco,* which would permit a showing of mere negligence or lack of diligence in the investigation, combined with actual prejudice, to establish a due process violation.[1] As the lead opinion notes, the Superior Court itself, sitting *en banc* in a subsequent appeal in the *Snyder* case, repudiated the *Mays* test. The lead opinion accurately explains why the *Mays* test is wrong and I join the lead opinion in rejecting that test.

In place of the *Mays* test, however, the lead opinion rejects the prevailing view in the federal Circuit Courts. That view would require the defendant to prove that the pre-arrest delay was intentionally undertaken by the government for the purpose of gaining a tactical advantage over the accused in the prosecution. Instead of this bad faith standard, which derives from the explicit language employed by the United States Supreme Court in its decisions in *Marion* and *Lovasco,* the lead opinion would adopt a subjective recklessness/conscience-shocking standard. It is here that I part ways with the lead opinion.

The lead opinion notes that, in *Snyder,* this Court addressed the *Marion/Lovasco* test at some length. We stated in *Snyder* that those two cases "stand for the proposition that to establish a due process violation for a delay in prosecution, a defendant must show that the passing of time caused actual prejudice and that the prosecution lacked sufficient and prop-

---

1. It is not apparent that *Mays* is still good law in the Ninth Circuit post-*Lovasco. See, e.g., United States v. Gilbert,* 266 F.3d 1180, 1187 (9th Cir.2001) (first prong of test requires actual prejudice and second prong requires showing that delay, when balanced against prosecution's reasons for it, offends "fundamental conceptions of justice which lie at the base of our civil and political institutions"); *United States v. Doe,* 149 F.3d 945, 948 (9th Cir.1998) (same); *U.S. v. Sherlock,* 962 F.2d 1349, 1353–54 (9th Cir.1989) (same).

er reasons for postponing the prosecution." *Snyder*, 713 A.2d at 601. The trial court in *Snyder* had concluded that the appellant there had not sustained his burden of proving actual prejudice, and thus it did not even inquire "whether the investigatory delay was intentional or proper.' " *Id.* at 599 (footnote omitted) (quoting trial court opinion). After determining that Snyder in fact had established actual prejudice, this Court remanded the case for the trial court to determine "if there were valid reasons to justify filing these charges after this extensive period of time." *Id.* at 606. In our analysis of what may be deemed "proper reasons for the delay," we opined that we "expressly disapprove[ ] of subjecting defendants to delayed prosecutions in which changing prosecutorial policies are the *only* reason to revive dormant investigations after the passage of time causes actual prejudice to the defense." *Id.* at 605. The lead opinion today notes that our decision in *Snyder* necessarily rejected the majority view of the federal Circuit Courts that delay intentionally undertaken by the prosecution to gain a tactical advantage is the only circumstance where the second prong of *Marion/Lovasco* would be satisfied.

The lead opinion attempts to further elucidate and clarify the second prong of the *Marion/Lovasco* test and, in so doing, strays even farther from the actual language in the U.S. Supreme Court's decisions. The lead opinion would hold that insufficient or improper reasons for delay exist whenever consideration of the totality of the evidence "shows that the delay was the product of intentional, bad faith, or **reckless** conduct by the prosecution." Opinion Announcing the Judgment of the Court at 25 (emphasis added). I joined in the *Snyder* opinion, and I recognize that the lead opinion fairly characterizes it today. However, upon further careful consideration of this recurring federal question, and particularly in light of the difficulties in the Pennsylvania experience since *Snyder*, which necessitate the lead opinion's attempt to clarify the standard today, I am now firmly convinced that we should simply return to the standard actually articulated by the Supreme Court and followed by a majority of the Circuit

Courts. Thus, I believe that a proper assessment of the reasons for the delay in initiating prosecution must be confined to the question of the prosecution's bad faith—*i.e.,* whether the delay was intentionally·undertaken by the prosecution to gain a tactical advantage over the defendant.

The lead opinion correctly notes that Article 1, Section 9, of the Pennsylvania Constitution is co-extensive with the due process protections of the United States Constitution and, thus, our query here is governed by cases from the U.S. Supreme Court, *i.e.,* primarily, *Marion* and *Lovasco.* The U.S. Supreme Court noted in *Lovasco* that "the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment." *Lovasco,* 431 U.S. at 790, 97 S.Ct. 2044. Because "the Due Process Clause has a limited role to play in protecting against oppressive delay," *id.* at 789, 97 S.Ct. 2044, the Clause is violated only if the delay caused actual prejudice to the defendant and "was an intentional device to gain tactical advantage over the accused." *Marion,* 404 U.S. at 324, 92 S.Ct. 455. *See also Lovasco, supra.*

Given the specific language in the controlling opinions, it is not surprising that an overwhelming majority of federal Circuit Courts, including our Third Circuit Court of Appeals, have held that *Marion/Lovasco* requires proof that the government acted *intentionally or in bad faith* to cause delay. *See United States v. Lebron–Gonzalez,* 816 F.2d 823, 831 (1st Cir.1987) ("intent by the prosecution to gain a tactical advantage"); *United States v. Hoo,* 825 F.2d 667, 671 (2nd Cir.1987) (defendant must "show that the government had improperly delayed his prosecution in order to gain a tactical advantage"); *United States v. Ismaili,* 828 F.2d 153, 167 (3d Cir.1987) (defendant bears burden of proving that "the government intentionally delayed bringing the indictment in order to gain some advantage" over defendant); *United States v. Crouch,* 84 F.3d 1497, 1515 (5th Cir.1996) (delay "intentionally undertaken by the government for the purpose of gaining some tactical advantage . . . or for some other impermissible, bad faith purpose"); *United States v. Rogers,* 118 F.3d 466, 476 (6th Cir.1997)

(defendant must prove delay was "device by the government to gain a tactical advantage"); *United States v. Sowa,* 34 F.3d 447, 450–52 (7th Cir.1994) (due process "only implicated if the government purposely delayed the indictment to take advantage, tactically, of the prejudice or otherwise acted in bad faith"; government bears burden to provide reasons for delay); *United States v. Benshop,* 138 F.3d 1229, 1232–33 (8th Cir.1998) ("Absent a showing that the government acted intentionally to harass or to gain a tactical advantage, no due process violation may be found"); *United States v. Johnson,* 120 F.3d 1107, 1110 (10th Cir.1997) (defendant must prove that "government delayed purposefully in order to gain a tactical advantage"); *United States v. Foxman,* 87 F.3d 1220, 1223 (11th Cir.1996) (delay must be "product of a deliberate act by the government designed to gain a tactical advantage").[2] *But see Howell v. Barker,* 904 F.2d 889, 895 (4th Cir.1990) (applying general due process test, rather than more specific test promulgated in *Marion* and *Lovasco* ); *Jones v. Angelone,* 94 F.3d 900, 905 (4th Cir.1996) (noting that Fourth and Ninth Circuits employ "more lenient" standard); *United States v. Gilbert,* 266 F.3d 1180, 1187 (9th Cir.2001) (first prong of test requires actual prejudice and second prong requires showing that delay, when balanced against prosecution's reasons for it, offends "fundamental conceptions of justice which lie at the base of our civil and political institutions"); *United States v. Doe,* 149 F.3d 945, 948 (9th Cir.1998) (same).

This intentional, bad faith standard is also the formulation stated and actually applied by this Court in *Commonwealth v. Daniels,* 480 Pa. 340, 390 A.2d 172, 179–181 (1978), a case which represented our first foray into this area after *Lovasco,* and a case cited with approval in *Snyder.* Many other state courts have also interpreted *Marion/Lovasco* as requiring a showing of intentional or bad faith conduct to establish a due

**2.** A majority of these Circuit Courts also require that the defendant prove such intentional conduct. *See Lebron–Gonzalez, supra; Hoo, supra; Ismaili, supra; Crouch, supra; Rogers, supra; Johnson, supra; Foxman, supra.*

process violation.[3] As Professor La Fave has noted, "there is no discernible inclination of the lower courts to treat anything except an intent to hamper the defense as an improper reason." 4 LA FAVE, ET AL., CRIMINAL PROCEDURE § 18.5(b), at 272 (2d ed.1999). Moreover, as another commentator has noted, the requirement that "the defendant proves that the government intentionally delayed the proceedings to gain a tactical advantage or to harass the defendant ... reflects judicial reluctance to interfere with prosecutorial discretion." Sarah Jane Cole, *Speedy Trial, II. Preliminary Proceedings, Thirtieth Annual Review of Criminal Procedure*, 89 GEORGETOWN LAW JOURNAL 1377, 1378 (May 2001) (citations omitted). As such, the requirement of intentional conduct is one dictated by considerations inherent in the Due Process Clause. Accordingly, in my view, any relaxation of the standard, if one is to be had, should come from the U.S. Supreme Court.

Instead of following the weight of authority, and the actual language of *Marion/Lovasco*, the lead opinion would approve a test which focuses on the totality of the circumstances and which would permit a finding that Due Process was violated if the delay resulted from "intentional, bad faith, or *reckless*

3. *See State v. Prince*, 581 So.2d 874 (Ala.Crim.App.1991); *State v. Medina*, 190 Ariz. 418, 949 P.2d 507 (App.1997); *Forgy v. State*, 16 Ark.App. 76, 697 S.W.2d 126 (1985); *State v. Kamalski*, 429 A.2d 1315 (Del.Super.1981); *United States v. Day*, 697 A.2d 31 (D.C.1997); *Wooten v. State*, 262 Ga. 876, 426 S.E.2d 852 (1993); *State v. Kruse*, 100 Idaho 877, 606 P.2d 981 (1980); *State v. Potts*, 11 Kan.App.2d 95, 713 P.2d 967 (1986); *Reed v. Commonwealth*, 738 S.W.2d 818 (Ky.1987); *State v. Dickerson*, 529 So.2d 434 (La.Ct.App.1988); *Commonwealth v. Best*, 381 Mass. 472, 411 N.E.2d 442 (1980); *People v. White*, 208 Mich.App. 126, 527 N.W.2d 34 (1994); *State v. Jurgens*, 424 N.W.2d 546 (Minn.Ct.App.1988); *Beckwith v. State*, 707 So.2d 547 (Miss.1997); *Dillard v. State*, 931 S.W.2d 157 (Mo.Ct.App.1996); *State v. Huebner*, 245 Neb. 341, 513 N.W.2d 284 (1994); *State v. Swann*, 322 N.C. 666, 370 S.E.2d 533 (1988); *People v. McCrorey*, 180 Misc.2d 75, 690 N.Y.S.2d 816 (N.Y.1999); *Fritz v. State*, 811 P.2d 1353 (Okla.Crim.App. 1991); *State v. Vanasse*, 593 A.2d 58 (R.I.1991); *State v. Utley*, 956 S.W.2d 489 (Tenn.1997); *In the Matter of N.M.P.*, 969 S.W.2d 95 (Tex.Ct.App.1998); *State v. Bailey*, 712 P.2d 281 (Utah 1985); *Johnson v. Commonwealth*, 9 Va.App. 176, 385 S.E.2d 223 (1989); *Hundley v. Ashworth*, 181 W.Va. 379, 382 S.E.2d 573 (W.V.1989); *State v. Wilson*, 149 Wis.2d 878, 440 N.W.2d 534 (1989); *Vernier v. State*, 909 P.2d 1344 (Wyo.1996).

conduct by the prosecution." Opinion Announcing the Judgment of the Court Op. at 1221 (emphasis added). In my view, a test that would involve the courts in balancing the prejudice to the defendant against less than intentional or bad faith conduct of the prosecution is inconsistent with the commands of the Due Process Clause. As the United States Court of Appeals for the Fifth Circuit reasoned in *Crouch:*

[S]everal other considerations ... strongly militate against utilizing a ... balancing test to determine whether prejudicial preindictment delay violates due process and in favor of requiring that the delay have been intentionally caused by the prosecution to gain a tactical advantage over the defendant or for some other bad faith purpose.... The items to be placed on either side of the balance (imprecise in themselves) are wholly different from each other and have no possible common denominator that would allow determination of which 'weighs' the most.... Inevitably, then, a 'length of the Chancellor's foot' sort of resolution will ensue and judges will necessarily define due process in each such weighing by their own 'personal and private notions' of fairness,' contrary to the admonition of *Lovasco.*

'[H]istorically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property,' ... and hence 'the Due Process Clause ... is not implicated by the lack of due care of an official causing unintended injury to life, liberty or property.' ... Contrary to these principles, however, the [balancing] test would find a due process violation where the government acted in good faith and did not deliberately seek to prejudice the party ultimately accused.

*Crouch,* 84 F.3d at 1512–13 (citations omitted) (emphasis in original). This reasoning, rooted as it is in the history and the purpose of the Due Process Clause, seems unimpeachable.

Although the lead opinion recognizes that a negligence standard is unworkable, the recklessness standard it would approve amounts to nothing more than a heightened negli-

gence standard.[4] As the U.S. Supreme Court has admonished, the Fourteenth Amendment should not become a "font of tort law." *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). A heightened negligence standard is no less impractical than a mere negligence standard, *i.e.,* it would still require "judicial oversight of decisions traditionally entrusted to the prosecutor." Opinion Announcing the Judgment of the Court Op. at 1220. Consequently, the lead opinion's standard opens the door to the type of hindsight and second-guessing employed here by the Superior Court and eschewed by the Supreme Court.

The standard the lead opinion would adopt is also problematic because the lead opinion suggests an equivalence of the recklessness standard with a conscience-shocking standard. Opinion Announcing the Judgment of the Court Op. at 1229–30. In *Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), however, the U.S. Supreme Court suggested that the terms "conscience-shocking" and "recklessness" are not synonymous. Indeed, a conscience-shocking standard is more closely aligned with *intentional* conduct than reckless conduct:

> [C]onduct *intended* to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.... Whether the point of the conscience-shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but "less than intentional conduct, such as recklessness or 'gross negligence'" is a matter for closer calls.

4. In many instances, Pennsylvania statutes use the terms "reckless" and "gross negligence" interchangeably. *E.g.,* 18 Pa.C.S. § 2504(a) (involuntary manslaughter); 20 Pa.C.S. § 5521 (powers, duties and liabilities of guardians); 20 Pa.C.S. § 8642 (limitation of liability in cornea harvesting); 27 Pa.C.S. § 8106 (landowner liability limitation); 27 Pa.C.S. § 8107 (project liability limitation); 42 Pa.C.S. § 1520 (adjudication alternative program); 42 Pa.C.S. § 6342 (court-appointed special advocates); 42 Pa.C.S. § 8340 (immunity of program administrators); 42 Pa.C.S. § 8338 (liability for donated food); 42 Pa.C.S. § 8527 (inmate health care).

*Id.* at 849, 118 S.Ct. 1708 (emphasis added). Since the terms "conscience-shocking" and "recklessness" do not always have equivalent connotations, the lead opinion's internally inconsistent standard will perpetuate confusion in this area.

More importantly, a conscience-shocking standard is a subjective standard far too reliant on individual judicial temperament to vindicate valid due process concerns. Simply put, what one judge may find shocking, another may not. As Justice Scalia noted in his concurrence in *Lewis:* "[*Lewis* ] resuscitates the *ne plus ultra,* the Napoleon Brandy, the Mahatma Ghandi, the Celophane of subjectivity, th' ol' 'shocks-the-conscience' test." *Id.* at 861, 118 S.Ct. 1708 (Scalia, J., concurring) (emphasis in original). Such a subjective standard is an inappropriate measure for a claimed violation of due process. *Lovasco,* 431 U.S. at 790, 97 S.Ct. 2044 ("the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment"); *Crouch,* 84 F.3d at 1512–13.

Significantly, this Court has approved a conscience-shocking standard in very limited circumstances—predominately in the area of weighing jury verdicts. *See Commonwealth v. Williams,* 554 Pa. 1, 720 A.2d 679 (1998) (conscience-shocking standard applicable to weight of evidence claims in criminal matter); *Commonwealth v. Walker,* 540 Pa. 80, 656 A.2d 90 (1995) (same); *Commonwealth v. Johnson,* 542 Pa. 384, 668 A.2d 97 (1995) (same); *G.J.D. v. Johnson,* 552 Pa. 169, 713 A.2d 1127 (1998) (conscience-shocking standard applicable to weighing jury verdict for punitive damages); *Neison v. Hines,* 539 Pa. 516, 653 A.2d 634 (1995) (conscience-shocking standard applicable to jury's award of no damages). The remedy in such instances is always a new trial, not an outright *dismissal* of the prosecution.

I believe it is unwise to apply such a subjective standard to requests for outright *dismissal* of charges premised on pre-arrest delay. This is particularly so given our jurisprudence in double jeopardy/prosecutorial misconduct cases—a jurisprudence which, since it involves the extreme sanction of dismiss-

al and focuses on prosecutorial conduct, is most similar to that presented here. In the prosecutorial misconduct cases, this Court prohibits a second prosecution only where it has been determined that the misconduct was *intentionally* undertaken to deny the defendant a fair trial. *See Commonwealth v. Martorano*, 559 Pa. 533, 741 A.2d 1221 (1999) (state double jeopardy provision barred retrial after reversal of defendants' convictions for first-degree murder and criminal conspiracy based on prosecutorial misconduct, where prosecutor acted in bad faith throughout trial); *Commonwealth v. Diehl*, 532 Pa. 214, 615 A.2d 690 (1992) (double jeopardy, as it relates to prosecutorial misconduct, attaches where prosecutorial misconduct is *calculated* to trigger mistrial); *Commonwealth v. Smith*, 532 Pa. 177, 615 A.2d 321 (1992); *Commonwealth v. Potter*, 478 Pa. 251, 386 A.2d 918, 923 (1978) (rejecting recklessness/gross negligence standard).

This Court in *Potter* rejected a negligence standard in double jeopardy/prosecutorial misconduct cases precisely because it failed to balance appropriately the interests at issue. The Court reasoned that:

Only when a deprivation of defendant's right to continue a trial before a particular tribunal is accomplished without his choice and no 'manifest necessity' for so doing is present, or when that deprivation is caused by misconduct designed to force the defendant to seek a mistrial, is the defendant so unjustifiably deprived of his right to the first jury's decision that society's interest in the punishment of those properly found guilty must give way to a discharge of the accused. When this deprivation is not the evident purpose of the prosecution, it is the defendant's and society's interest in a fair trial that is primarily affected, and the remedy of a new trial, while it does of course affect the defendant's interest in the first jury's decision, is necessary and sufficient to vindicate both the citizen's interest in a fair trial and the societal interest in bringing those properly found guilty to punishment.... [T]he public interest in convicting those guilty of crimes is too important an interest to be subordinated to a concept of a prosecuting attorney's negligence,

even though it be labeled 'gross'; defendants are adequately protected by the sanction of complete discharge which is imposed when the government's agent acts with the intent to abort the trial.

*Id.* at 925. The same reasoning should guide our formulation of a standard in the pre-arrest delay area.

The primary protection against delayed prosecutions is the applicable statute of limitations; the General Assembly is generally in the best position to balance the interests that inform the determination of the appropriate limitations period. As noted in *Snyder,* 713 A.2d at 599–600, there is no statute of limitations on murder prosecutions because of the gravity of the offense, and thus the only available challenge is a constitutional one, to wit, whether the truly fundamental concerns suggested by this Nation's traditional notion of Due Process are implicated. *See Lovasco,* 431 U.S. at 790, 97 S.Ct. 2044 (Due Process is concerned with "those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' . . . and which define 'the community's sense of fair play and decency' ") (citations omitted). Any right to avoid defending against allegedly stale charges must be tempered by the primacy placed upon apprehending and prosecuting murderers, and the deference shown the executive and state function. The U.S. Supreme Court and this Court have appropriately placed a heavy burden upon a defendant claiming a due process violation for pre-arrest delay. The constitutional precepts at issue are best served by requiring proof of intentional or bad faith prosecutorial conduct before a delay will be found to violate due process.

Accordingly, although I concur in the judgment, I respectfully disagree with the lead opinion's proposed further relaxation of the *Marion/Lovasco* standard.

Justice NIGRO, concurring.

I join the Opinion Announcing the Judgment of the Court except for that portion of its decision that applies the second prong of the due process standard for pre-arrest delay, as developed by the lead opinion, to the facts of the instant case.

I agree with the lead opinion that Scher failed to meet the threshold burden of demonstrating actual prejudice. Once this conclusion is reached, however, I see no need to even consider the second prong of the test. I would simply hold that Scher's due process claim fails because he did not demonstrate actual prejudice.

Justice SAYLOR, concurring.

Although I concur in the disposition announced by the Court, I do not fully agree with the lead opinion's analysis and conclusion surrounding the prejudice component of Appellant's due process claim.

The prejudice element of a due process claim based upon pre-arrest delay requires proof of both actual and substantial prejudice. *See United States v. Marion,* 404 U.S. 307, 324, 325–26, 92 S.Ct. 455, 465, 466, 30 L.Ed.2d 468 (1971); *Jones v. Angelone,* 94 F.3d 900, 907 (4th Cir.1996). To establish actual prejudice a defendant cannot rely upon vague, speculative, or conclusory allegations. *See United States v. Crouch,* 84 F.3d 1497, 1515 (5th Cir.1996). Rather, such prejudice is demonstrated where the delay results in a loss of evidence or the absence of witnesses, and where there is a showing that the evidence or testimony would have actually aided the defense. *See United States v. Beszborn,* 21 F.3d 62, 66 (5th Cir.1994). Substantial prejudice, however, involves proof that a defendant's ability to defend against the charges was meaningfully impaired to an extent that the disposition of the criminal proceeding was likely affected. *See Jones,* 94 F.3d at 907–08. In this respect, it is the defendant's burden to demonstrate that the lost testimony or evidence is not available through other means. *See United States v. Rogers,* 118 F.3d 466, 475 (6th Cir.1997).

I believe that Appellant satisfied his burden of proving actual prejudice based upon the absence of testimony from Dr. Grace, the physician who performed the initial autopsy, as well as the coroner. A critical issue at trial was the distance at which the fatal shot was fired, since Appellant maintained at trial that the gun accidentally discharged during a struggle,

and that the wound was consistent with the shot having been fired at close range. In contrast, the Commonwealth asserted that the gunshot wound was consistent with a medium-to-long-range firing, indicative of murder. Toward this end, the Commonwealth challenged the qualifications and findings of Dr. Grace. While the initial autopsy report contained findings consistent with a close-range shooting, Appellant was unable to present testimony from Dr. Grace concerning his qualifications and experience and explaining his findings. Furthermore, the absence of testimony from the coroner, who assisted in the autopsy and determined that the cause of death was accidental, constituted actual prejudice.

Nevertheless, as noted, a defendant must also demonstrate that the prejudice was substantial, which is a heavy burden. *See generally State v. Alexander,* 310 N.J.Super. 348, 708 A.2d 770, 774 (App.Div.1998) (noting that, since 1975, there have been only two federal cases in which due process claims based upon pre-indictment delay have been upheld). In this regard, the ability of a defendant to mount a defense is not controlling. For example, in *Snyder,* although the defendant was able to offer testimony, including expert opinions from a pathologist and a toxicologist, consistent with his theory of defense (suicide), he was unable to present expert testimony in the form of a psychiatric autopsy that would have bolstered such theory. *See Snyder,* 552 Pa. at 48, 57–58, 713 A.2d at 597–98, 602–03.

Although I view this as a close case, I do not believe that Appellant's ability to defend against the charges was sufficiently impaired; indeed, as amply demonstrated by the lead opinion, he was able to marshal considerable expert opinion and fact testimony supporting his theory of defense. Accordingly, I would simply hold that Appellant has failed to demonstrate substantial prejudice.

Chief Justice ZAPPALA, dissenting.

Twenty years passed between the time that Martin Dillon died from a shotgun wound and the filing of homicide charges against Dr. Stephen Scher in connection with the incident. During that time, the District Attorney's Office failed to

pursue any investigation of the events surrounding the shooting and chose not to file charges against Dr. Scher. The position of District Attorney changed hands several times, but no efforts were made to renew an investigation until shortly before the charges were filed. Although the matter was dormant during those twenty years, with no active investigation during eighteen of those years, the passage of time resulted in the destruction of critical evidence.

The Commonwealth's inordinate and unexcused delay in filing charges against Dr. Scher resulted in actual prejudice to Dr. Scher's ability to defend himself against the charges. At trial, the pivotal issue was whether Mr. Dillon's death resulted from an accidental firing of the shotgun as he and Dr. Scher struggled with the shotgun or resulted from the intentional and deliberate firing of the shotgun by Dr. Scher at a distance of several feet away from Dillon. The Commonwealth premised its theory on the testimony of expert witnesses following an autopsy conducted 18 years after Dillon's death. The expert testimony sought to contradict the findings made by Dr. James Grace based upon the autopsy he conducted immediately after Dillon's death. During the trial, the competency of Dr. Grace to conduct the autopsy and the findings themselves were challenged by the Commonwealth.

The Commonwealth went to great lengths to disparage and criticize Dr. Grace's abilities and to undermine specific critical physical findings made by Dr. Grace regarding the condition of the wound. Dr. Grace's findings were contrary to the Commonwealth's theory of the case and undermined the testimony of Commonwealth experts who had not examined the body until it was exhumed eighteen years later. While Dr. Grace's observations of the body and the shotgun wound were of paramount importance in determining whether the shotgun fired accidentally, the Commonwealth's delay in bringing the prosecution resulted in the unavailability of Dr. Grace as a witness.

Dr. Grace died on July 27, 1995. His death occurred before the Commonwealth filed charges against Dr. Scher. While Dr. Grace lived for 19 years after the shooting incident, the

Commonwealth lost the audio recording made during the 1976 autopsy performed by Dr. Grace and failed to subsequently preserve his recollection of the examination of crucial evidence. Other than the autopsy report prepared by Dr. Grace shortly after the incident, no efforts were made by the Commonwealth to interview Dr. Grace for the purpose of recording his personal observations of the physical condition of the body or the medical conclusions that were premised upon those observations. While Dr. Grace's medical findings were made the center of controversy by the Commonwealth at trial, Dr. Scher was deprived of the opportunity to prepare his defense against the homicide charges because of the Commonwealth's failure to file the charges within a reasonable period of time.

The resulting prejudice to Dr. Scher's defense due to the unavailability of this crucial witness was compounded by the Commonwealth's deliberate tactics at trial to disparage the findings made by Dr. Grace which were contrary to the prosecution's theory. In order to support its theory of the shooting, the Commonwealth attempted to flatly contradict Dr. Grace's observations by suggesting to the jury that as a physician he was incompetent to make even the simplest physical observations and claimed that the observations recorded by Dr. Grace in his autopsy report were not those that Dr. Grace actually intended to make.

As detailed below, the Commonwealth was willing to go to outrageous lengths to dispute the physical findings made by Dr. Grace when those findings contradicted the prosecution's theory. For example, the Commonwealth presented an expert witness to testify that when Dr. Grace referred to the area surrounding the shotgun wound as "somewhat darkened" in his autopsy report, Dr. Grace could have meant that the area surrounding the wound was not darkened at all. This reference to the darkened area surrounding the wound in Dr. Grace's autopsy report was extremely significant because the presence of carbonaceous material around the wound was inconsistent with the prosecution's theory that the shotgun was fired from a distance.

I would affirm the Superior Court's order because the Commonwealth's protracted delay in filing the charges against Dr. Scher resulted in the loss of critical evidence for his defense. The Commonwealth's inaction prejudiced Dr. Scher and deprived him of his due process rights under the United States Constitution.

In *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the U.S. Supreme Court addressed the issue of whether the dismissal of a federal indictment was constitutionally required by reason of the passage of a three year period between the occurrence of alleged criminal acts and the filing of the indictment. The appellees, who were engaged in the business of selling and installing home improvements, were indicted and charged with 19 counts involving fraudulent misrepresentations, alteration of documents and deliberate nonperformance of contracts. The period covered by the indictment was from March 15, 1965, to February 6, 1967. The indictment was filed on April 21, 1970.

The appellees filed a motion to dismiss the indictment, asserting that the delay in the prosecution of the charges violated their rights to due process and to a speedy trial under the Fifth and Sixth Amendments to the U.S. Constitution. No evidentiary hearing was held on the motion. The motion and argument of counsel indicated that the appellees' business had been the subject of a cease-and-desist order issued by the Federal Trade Commission on February 6, 1967. In October of 1967, a series of newspaper articles reported statements made by the U.S. Attorney for the District of Columbia describing his office's investigation of home improvement firms, including forthcoming indictments. The appellees' business was not specifically mentioned by the U.S. Attorney, although the business was identified in the article. In 1968, the U.S. Attorney's Office obtained records from the appellees' business and interviewed one of its officers. The grand jury that indicted appellees was impaneled in September of 1969.

The appellees sought dismissal of the charges, arguing that the delay was due to the negligence of the U.S. Attorney in investigating and presenting the case to the grand jury. No

specific prejudice was demonstrated; however, the appellees claimed that recollection of specific acts and representations made several years before would be affected by the delay. The District Court dismissed the charges for lack of speedy prosecution, concluding that the U.S. Attorney was aware of the relevant facts in 1967 and that defense of the case would be seriously prejudiced by the three year delay.

On direct appeal, the U.S. Supreme Court reversed the judgment of the District Court. The court addressed the appellees' claim in the context of the Sixth Amendment right to a speedy and public trial. The appellees claimed that their rights to a speedy trial were violated by the delay between the end of the criminal scheme charged and the indictment. They argued that the delay was so substantial and inherently prejudicial that dismissal of the indictment was required under the Sixth Amendment.

The U.S. Supreme Court rejected appellees' claim, finding that the speedy trial provision of the Sixth Amendment does not apply until an individual becomes an "accused." This triggering event was found to have occurred when the appellees were indicted in 1970.

On its face, the protection of the Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been "accused" in the course of the prosecution. These provisions would seem to afford no protection to those not yet accused, nor would they seem to require the Government to discover, investigate, and accuse any person within any particular period of time. The Amendment would appear to guarantee to a criminal defendant that the Government will move with the dispatch that is appropriate to assure him an early and proper disposition of the charges against him. "The essential ingredient is orderly expedition and not mere speed." *Smith v. United States*, 360 U.S. 1, 10, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959).

*Marion* at 313, 92 S.Ct. 455. The Court declined to extend the reach of the Sixth Amendment to the period prior to

arrest, noting that statutes of limitations serve as the primary guarantee against the filing of overly stale criminal charges.

In support of their claim for dismissal, the appellees relied solely on the passage of time between the alleged crime and the indictment and the potential for prejudice. Since no claim of actual prejudice was made by appellees, the Court found that its analysis of the Sixth Amendment claim was dispositive. Noting that the appellees could raise the issue of actual prejudice when the matter proceeded to trial, the Court addressed the potential claim that the delay in prosecution would implicate the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

> It is appropriate to note here that the statute of limitations does not fully define the appellees' rights with respect to the events occurring prior to indictment. Thus, the Government concedes that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused. However, we need not, and could not now, determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution. Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution. To accommodate the sound administration of justice to the rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the circumstances of each case. It would be unwise at this juncture to attempt to forecast our decision in such cases.

*Id.* at 324, 92 S.Ct. 455 (citations and footnotes omitted).

The Court determined that the appellees had not demonstrated that the pre-indictment delay by the Government had violated the Due Process Clause. The appellees had not alleged or proved that the delay had resulted in actual preju-

dice; nor had they established that the Government had intentionally delayed the indictment to gain a tactical advantage. The appellees' due process claim was found to be speculative and premature at that stage of the proceedings.

Six years later, the U.S. Supreme Court granted certiorari in *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), to consider when the U.S. Constitution would require an indictment to be dismissed because of delay between the commission of an offense and the initiation of prosecution. The respondent had been indicted for possessing eight firearms stolen from the United States mails, and for the unlicensed dealing of firearms between July 25 and August 31, 1973. The respondent moved to dismiss the indictment based upon an eighteen month delay before the indictment was filed.

During a hearing before the District Court, the respondent introduced a report of the investigation undertaken by the Postal Inspector. The report, which was prepared one month after the offenses were committed, indicated that the respondent had already admitted to Government agents that he had sold five of the stolen firearms. It also reflected that the purchaser of the stolen firearms had told Government agents that the respondent had actually sold him eight firearms. The report indicated that the agents had not confirmed or refuted respondent's claim that he had found the firearms in his car after visiting his son, a mail handler, at work.

The respondent asserted that the delay had prejudiced his defense because the testimony of two material witnesses had been lost as a result. Both witnesses had died before the indictment was filed. At the hearing, respondent admitted to possession and sale of all eight weapons. The respondent claimed that one of the witnesses, Tom Stewart, had been his source for two or three of the firearms. Stewart had not been identified as the source when the respondent was questioned by the Postal Inspector. The respondent also testified that his brother, who was the second witness, was present when he called to obtain the firearms and had witnessed the sales of the firearms.

The Government stipulated that little additional evidence concerning the crimes was obtained in the 17 months after the report was prepared, and no effort to explain the delay was made. It was not conceded, however, that the investigation had ended after the report was prepared. Although the report stated that there was no evidence indicating that the respondent's son was involved, the Government indicated that its theory was that the son was responsible for the thefts.

After the hearing, the District Court dismissed the indictment. The court found that the Government had all the information relating to the offenses charged against the respondent by the date that the report was prepared. The 17 month delay before the case was submitted to the grand jury was found to be unnecessary and unjustified. The court determined that the respondent had been prejudiced by the delay due to the death of Stewart, a material witness.

On appeal to the U.S. Court of Appeals for the Eighth Circuit, the Government asserted that the investigation had been kept open to establish the involvement of the respondent's son in the theft. The Court of Appeals accepted the explanation offered by the Government, but affirmed the District Court's finding that the Government's actions were neither necessary nor justified. It was further determined that the respondent had demonstrated that his defense had been impaired by the loss of Stewart's testimony, which could have supported the respondent's claim that he did not know that the guns were stolen from the United States mails. The Court of Appeals affirmed the dismissal of the charges for possession.[1]

The U.S. Supreme Court reversed on the basis that the delay was caused by the Government's efforts to identify other individuals who may have been involved in the offenses. The explanation offered by the Government for the pre-indictment delay was found to be sufficient to avoid dismissal of the indictment under the circumstances. The Supreme Court

1. The Court of Appeals reversed the dismissal of the charge for the unlicensed dealing in firearms because the respondent had not alleged that Stewart could have provided exculpatory evidence on that charge.

determined that compelling the respondent to stand trial would not be fundamentally unfair where the Government had deferred filing charges against the respondent while the investigation continued.

In reaching its decision, the Supreme Court observed that "the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." 431 U.S. at 790, 97 S.Ct. 2044. Dismissal of charges for pre-indictment delay was found not to be warranted for a mere disagreement regarding the prosecutor's judgment as to when to seek an indictment.

> Judges are not free, in defining "due process," to impose on law enforcement officials our "personal and private notions" of fairness and to "disregard the limits that bind judges in their judicial function." Our task is more circumscribed. We are to determine only whether the action complained of here, compelling respondent to stand trial after the Government delayed indictment to investigate further-violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions," . . . and which define "the community's sense of fair play and decency . . . ."

*Id.* 790, 97 S.Ct. 2044.

The Supreme Court concluded that prosecutors do not deviate from the "fundamental conceptions of justice" by deferring indictments until they have probable cause to believe an accused has committed an offense. Nor was any duty to be imposed upon prosecutors to file charges as soon as probable cause exists, but before they were satisfied that they would be able to establish a suspect's guilt beyond a reasonable doubt. The Supreme Court rejected the argument that once the Government has assembled sufficient evidence to prove guilt beyond a reasonable doubt, it should be constitutionally required to file charges, even if its investigation of the entire criminal transaction was not complete.

Several considerations were weighed in concluding that the timing of an indictment should be left to the discretion of the prosecutors. First, the Supreme Court observed that "compel-

ling a prosecutor to file an indictment as soon as the requisite proof had been developed against one participant on one charge would cause numerous problems in those cases in which a criminal transaction involves more than one person or more than one illegal act." *Id.* at 793, 97 S.Ct. 2044. Second, insistence on immediate prosecution "would pressure prosecutors into resolving doubtful cases in favor of early—and possibly unwarranted—prosecutions." *Id.* "Finally requiring the Government to make charging decisions immediately upon assembling evidence sufficient to establish guilt would preclude the Government from giving full consideration to the desirability of not prosecuting in particular cases." *Id.* at 794, 97 S.Ct. 2044. Based upon these considerations, the Supreme Court held that the prosecution of an accused following an investigative delay does not deprive the accused of due process, "even if his defense might have been somewhat prejudiced by the lapse of time." *Id.* at 796, 97 S.Ct. 2044.

The Supreme Court reiterated, however, that the prosecutor's discretion is not without limits, and that constitutional challenges may be brought for pre-indictment delay where the Due Process Clause has been violated.

> In Marion we noted with approval that the Government conceded that a "tactical delay" would violate the Due Process Clause. The Government renews that concession here, . . . and expands it somewhat by stating: "A due process violation might also be made out upon a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense. . . ." As the Government notes, however, there is no evidence of recklessness here.

* * *

> In Marion we conceded that we could not determine in the abstract the circumstances in which preaccusation delay would require dismissing prosecutions. 404 U.S. at 324, 92 S.Ct. 455. More than five years later, that statement

remains true. Indeed, in the intervening years so few defendants have established that they were prejudiced by delay that neither this Court nor any lower court has had a sustained opportunity to consider the constitutional significance of various reasons for delay. We therefore leave to the lower courts, in the first instance, the task of applying settled principles of due process that we have discussed to the particular circumstances of individual cases. We simply hold that in this case the lower courts erred in dismissing the indictment.

*Id.* at 796–97, 97 S.Ct. 2044.

This Court was presented with the opportunity to address a claim of deprivation of due process based upon a pre-arrest delay of eleven years and two months in *Commonwealth v. Snyder,* 552 Pa. 44, 713 A.2d 596 (1998). The Commonwealth filed a criminal complaint against the appellant charging two counts of murder in connection with the deaths of his wife and infant son. The charges were filed more than eleven years after the appellant's wife and son had perished in a fire inside the family home. Seven years had passed since the investigation into the deaths had been concluded.

The factual circumstances of the case were summarized as follows:

On July 2, 1982, Appellant's wife and six-week-old son died in a fire inside their home in Wright Township, Luzerne County, Pennsylvania. The Appellant was scheduled to work from 1:00 p.m. until 10:00 p.m. on the day of the fire. Earlier that day, a neighbor saw the Appellant leave the house between 12:15 and 12:20 p.m. Later, two young boys, ages nine and twelve, were playing in a neighbor's yard when they saw the Snyder house was on fire and ran to the house. Unable to enter the house because the front door was locked, they told a neighbor who notified the fire department at 1:31 p.m. Fire fighters arrived within approximately four minutes and found the Appellant's wife and child in the master bedroom, both dead from carbon monoxide poisoning. Autopsy tests revealed barbiturates and alcohol in Mrs. Snyder's blood, with a blood alcohol content

of .046%. The Commonwealth's expert witness opined that the fire was incendiary in nature, and that it was deprived of oxygen, which caused it to smolder for approximately one hour, filling the house with smoke.

Immediately after this incident, the Wright Township Police Department, Pennsylvania State Police, and the Luzerne County District Attorney's Office commenced an investigation, which did not yield any arrests after two years. In 1984, the Luzerne County District Attorney empaneled [sic] a special investigating grand jury to probe the deaths of Mrs. Snyder and her child. The grand jury investigation continued until some time in 1986, when it ended without returning any indictments.

The Appellant continued to live and work in Luzerne County, and the investigation remained dormant throughout the administration of several District Attorneys. No new or additional evidence became known after the grand jury concluded its investigation in 1986. During 1993, the newly elected District Attorney of Luzerne County, Peter Paul Olszewski, Jr., reopened the case. The Commonwealth filed a criminal complaint charging the Appellant with two counts of murder on September 8, 1993.

*Id.* at 597.

The appellant filed a pre-trial motion to dismiss the charges on the basis that the eleven year lapse in time before the charges were filed violated his due process rights under the Pennsylvania Constitution and the U.S. Constitution. The appellant asserted that his defense to the charges was substantially prejudiced by the extraordinary delay because evidence establishing that his wife had committed suicide had become unavailable because of the delay. The trial court conducted an evidentiary hearing at which the appellant introduced evidence establishing that witnesses who could have testified that his wife was severely depressed after the birth of their son had died before the charges were filed, and that other possible witnesses could not remember many facts because the lengthy delay had dimmed their memories. The Commonwealth did not present any evidence at the hearing.

The trial court denied the appellant's motion to dismiss the charges. When the matter proceeded to trial, the parties presented oral argument to the presiding judge on the issue. The presiding judge also determined that the appellant was not entitled to dismissal of the charges, finding that the delay had not substantially prejudiced the appellant because the evidence that the appellant sought to present was either not exculpatory or could be presented through other witnesses. The appellant was subsequently convicted of two counts of first degree murder and arson. The judgment of sentence was affirmed by the Superior Court.

We granted the appellant's petition for allowance of appeal to address the limited issue of whether the pre-arrest delay had violated his right to due process. We determined that the trial court had committed an error of law when it found that the appellant had not sustained his burden of proving prejudice. We concluded that the appellant had demonstrated actual prejudice based upon the record before us. Because the record was silent as to the existence of any proper reason for delaying the filing of criminal charges, we reversed the order of the Superior Court and remanded the matter to the trial court for the limited purpose of determining whether there were valid reasons to justify filing of the charges after such an extensive period of time.[2]

We observed that there is no statute of limitations that applies to murder charges in the Pennsylvania Crimes Code; "[h]owever, statutes of limitation do not define the full extent of the rights of the accused concerning the time in which the charges can be filed." *Id.* at 599. "The constitutional right to due process also protects defendants from having to defend stale charges, and criminal charges should be dismissed if improper pre-arrest delay causes prejudice to the defendant's right to a fair trial." *Id.* at 599–600 (citing *Commonwealth v. Daniels*, 480 Pa. 340, 390 A.2d 172 (1978)).

2. On remand, the trial court determined that there were valid reasons for the delay and that the delay was proper. In a split decision, the Superior Court affirmed. *Commonwealth v. Snyder*, 761 A.2d 584 (Pa.Super.2000).

The constitutional right to due process under Article I, Section 9 of the Constitution of Pennsylvania provides the same protections to an accused in the area of pre-arrest delay as does the U.S. Constitution. "This Court has chosen to extend greater protections to criminal defendants pursuant to our state Constitution than federal courts have recognized pursuant to the United States Constitution in other areas of constitutional law, but this Court has never afforded defendants greater protections when examining due process challenges based on pre-arrest delay." *Id.* at 602 (footnote omitted). Therefore, our analysis of the appellant's due process claims addressed his rights under both the state and federal constitutions.

We undertook the analysis of appellant's claims starting with the perspective provided by the U.S. Supreme Court decisions in *Marion* and *Lovasco.* "[T]he Marion and Lovasco decisions stand for the proposition that to establish a due process violation for a delay in prosecution, a defendant must show that the passing of time caused actual prejudice and that the prosecution lacked sufficient and proper reasons for postponing the prosecution." *Id.* at 601. The two-pronged analysis required that we determine: (1) whether pre-arrest delay resulted in actual prejudice to the accused; and (2) whether the Commonwealth's reasons for postponing the appellant's arrest were proper.

At trial, the state of mind of the appellant's wife was a crucial factor in determining whether the appellant was guilty of the homicide and arson charges. The Commonwealth's theory was that the appellant had drugged his wife, started the fire and left the house. The circumstantial evidence presented by the Commonwealth indicated that the wife had barbiturates in her system and that a trail of gasoline and oil in the house had been ignited. In anticipation of the appellant's defense that his wife was suffering from post-partum depression and committed suicide by taking barbiturates and setting fire to the house, the Commonwealth introduced twelve witnesses to testify that the wife had appeared to be happy shortly before her death.

The appellant testified on his own behalf and introduced the testimony of several witnesses that the wife appeared to be depressed after the birth of her child. A toxicologist testified that the barbiturates ingested by the wife could not have been given to her surreptitiously because they had a bad taste. Due to the lengthy delay in bringing the charges, the appellant was unable to introduce the testimony of several witnesses who had died before the trial. The evidentiary hearing on the motion to dismiss disclosed the purpose for which the appellant would have offered the witnesses' testimony, as follows:

> The Appellant contends that these witnesses would have testified that Mrs. Snyder was severely depressed after the birth of her son. Specifically, Monsignor Nolan, who was the Snyders' family friend and parish priest, died before the Appellant's arrest. Monsignor Nolan had many contacts with Mrs. Snyder before her death because he was working with her to prepare for the baby's baptism, which was scheduled for the day after the fire. According to Margaret Krupa, who drove the Monsignor to the Snyder home to administer the last rites, the Monsignor told her that after seeing the bodies in the house, he believed that Mrs. Snyder committed suicide. Because Monsignor Nolan died before the Commonwealth filed these charges, the Appellant could not present evidence concerning the basis for the Monsignor's opinion that Mrs. Snyder committed suicide.

> The Appellant's father, George Snyder, was also deceased at the time of the trial. The Appellant's brother said that Mrs. Snyder's co-workers told George Snyder that she said goodbye to her co-workers the day before the fire. Appellant's brother also testified that Monsignor Nolan told the Appellant's father that he believed that Mrs. Snyder had committed suicide.

*Snyder*, 713 A.2d at 598. Furthermore, medical records of the appellant's wife reflected that she had dropped from a weight of 150 pounds before the birth of her son to 115 pounds within thirty-seven days after the birth. The obstetrician who attended the appellant's wife was also unavailable to testify by

the time of trial, however, because he suffered from severe Alzheimer's disease.

The evidence presented radically different portrayals of the state of mind of the appellant's wife at the time of her death. The Commonwealth's extensive delay in filing charges against the appellant deprived him of the opportunity to present the testimony of witnesses who had an opportunity to observe the wife's behavior and demeanor after the birth of her child. "Because of the developments in the case at trial, the Commonwealth introducing considerable evidence concerning Mrs. Snyder's state of mind, and the unavailability of key witnesses close to Mrs. Snyder, we conclude that the Commonwealth's failure to file these charges sooner resulted in actual prejudice to the Appellant in presenting his defense at trial." *Id.* at 603.

We then analyzed whether the Commonwealth's reasons for postponing the appellant's arrest were proper. Although the trial court had described the period of time between the wife's death and the appellant's arrest as "investigatory delay," we determined that there was no basis in the record to conclude that the delay was required for further investigation. The appellant did not claim that any of the District Attorneys of Luzerne County intentionally postponed the prosecution to gain a tactical advantage; however, the appellant did assert that renewing an investigation that had been dormant and filing charges after 11 years based on change in the District Attorney's Office was improper.

We concluded that the appellant was not required to establish that the Commonwealth intentionally delayed the prosecution to gain a tactical advantage over the appellant in order to establish a violation of his due process rights. We held that "the decision to prosecute the Appellant after more than 11 years, with no additional evidence and with no ongoing investigation in the last seven years, is so egregious that it cannot withstand even the most deferential standard of review." *Id.* at 605.

We stated that,

Whether done intentionally or not, the Commonwealth gained a tremendous strategical advantage against the Appellant due to the passage of time and the loss of critical defense testimony through death and memory loss. **This Court expressly disapproves of subjecting defendants to delayed prosecutions in cases in which changing prosecutorial policies are the only reason to revive dormant investigations after the passage of time causes actual prejudice to the defense.** We hold that, based on all of the facts of this case, bringing this prosecution after more than eleven years caused actual prejudice to the Appellant and deprived him of due process of law unless there were proper reasons for the delay.

We emphasize that due process violations will occur only in extreme cases, in which no valid reasons justify a defendant's arrest after an inordinate amount of time without investigation. This Court recognizes that murder prosecutions often come to fruition after many years of investigation. We do not intend to limit the power of the Commonwealth to prosecute a murderer if and when an investigation yields new evidence after many years of inactivity. However, if no additional evidence appears, the delay results in actual prejudice to the defendant, and there are no proper reasons for postponing the defendant's arrest, the due process clauses of the Constitutions of the United States and Pennsylvania require that the charges be dismissed.

*Id.* at 605 (emphasis added).

Applying this analysis, the record in this case establishes that the 20 year pre-arrest delay resulted in actual and substantial prejudice to Dr. Scher and that the Commonwealth lacked sufficient and proper reasons for the inordinate delay.[3]

---

**3.** When the courts have addressed the issue of pre-arrest delay, the first examination is typically whether the passage of time has resulted in actual prejudice to the accused. Since it is the rare instance in which pre-arrest delay has been found to result in actual prejudice, analysis of the prejudice prong of the test under the Due Process Clause will ordinarily be dispositive of the accused's claim. I have chosen to address Dr. Scher's claim of a due process violation by first reviewing the events that culminated in the 20 year delay because it assists in an

At the hearing, and throughout the course of the proceedings, the Commonwealth took the position that the defense was required to prove that Dr. Scher suffered actual and substantial prejudice because of the passage of time, and that the delay was an intentional device by the prosecution to gain a tactical advantage over the accused. The Commonwealth asserted that neglect and failure to conduct a proper investigation would not be sufficient to warrant dismissal of the charges. R. 1447ag–1449ag.[4] The Commonwealth was highly critical of the way in which the investigation into Mr. Dillon's death was conducted and did not argue that the investigation was handled properly. To the contrary, the prosecutor stated:

> We're not contesting that early on the investigation was not done perfectly, that there was foot dragging, other things could have been done and should have been done that were done much later. We have conceded to that, but that is not the issue.

R. 1456ag.

On March 17, 1997, defense counsel filed an omnibus pretrial motion seeking, inter alia, dismissal of the charges based upon the pre-arrest delay. The trial court conducted an evidentiary hearing on the motion on May 7, 1997. At the evidentiary hearing, defense counsel presented the testimony of the individuals who had served as District Attorney for Susquehanna County during the period of time between the death of Martin Dillon and the arrest of Dr. Scher. The position of District Attorney was a part-time position in that county.

The first witness was Edward Little, Jr., whose initial term

understanding of how Dr. Scher was prejudiced by the lack of any investigation during a significant portion of that time.

**4.** The pages in the reproduced record filed by the Attorney General's Office are marked with two different numerical designations. The references to the reproduced record are designated by a page number followed by the letters "ag". To avoid confusion as to the precise page of the reproduced record filed with this Court, the references in this opinion incorporate the letter designation provided by the Attorney General's Office.

as District Attorney began in 1968.[5] District Attorney Little served three successive terms and left the office at the end of 1979 or early 1980. R. 1439ag–1440ag. He was in office when Martin Dillon died. District Attorney Little did not undertake any prosecution of any individual in connection with the death of Martin Dillon; nor was any arrest made during his tenure. No request was made by District Attorney Little to the Attorney General's Office for assistance in the investigation or prosecution.

At that time, the District Attorney's office employed an investigator, Chief County Detective Willard G. Collier. Detective Collier, the only detective employed by the District Attorney's Office, was assigned to investigate the death of Martin Dillon. Detective Collier died before the arrest of Dr. Scher. He was responsible for gathering and reviewing the evidence in connection with the death.

Based upon his investigation shortly after Mr. Dillon's death, Detective Collier indicated to District Attorney Little that he believed that the shooting was not accidental and that Dr. Scher may have been responsible. Detective Collier prepared a letter dated June 9, 1976, a week after Mr. Dillon's death, to reflect the fact that he wanted the investigation to remain open despite the fact that Coroner John Conarton had determined it to be an accidental death.[6] The letter was addressed to District Attorney Little, who described the letter as something he and Detective Collier had cooperated in and as "a mutual idea". R. 1443ag–1444ag.

The June 9, 1976, letter summarized Detective Collier's initial impressions that the evidence did not support Dr. Scher's statements on June 2, 1976, as to how the shooting occurred. The letter stated as follows:

1. At about 1200 Hours on June 2, 1976, Subject deceased his Mortal Life by Physical Trauma, namely a Contact Shot–Gun Blast to the Chest.

5. In his private law practice, District Attorney Little represented Edna Scher in a divorce action filed against her by Dr. Scher. R. 1478ag.

6. Coroner John Conarton died on February 28, 1992, before the arrest of Dr. Scher. R. 1467ag, 2748ag.

2. Susquehanna County Coroner John Conarton issues a tentative Verdict of Accidental Death: Subsequent conversations indicate that he can and will change this Verdict, if Investigation now being conducted by this and other Investigators Warrant it.

3. From personal knowledge of Subject, his Religion, his care-free State of mind at 1530 Hours when he talked to Troopers Fekette and Selinkas in Montrose, Rule out any possibility of deliberate self-destruction.

4. An examination of the Scene, angle of the Wound of Entrance, and information available at present are not satisfactory to this Investigator as being caused by a fall on the weapon.

5. The Physiognomy of one Subject, his partial destruction of Weapon, and his explanation of the incident are not satisfactory to this Investigator.

6. The Investigation has been severely hampered by gossip, Rumors and at least one erroneous Newspaper account. Top City Reporters have been getting unsigned notes Anonymous calls, and information. Through personal friendship it has been possible to get them to let us complete our Investigation.

7. Time is vital at this point: We must have all photographs for intensive examination, Laboratory reports, and further Interviews with persons who may have any knowledge, as well as re-interviewing subjects with information of importance.

8. A Coroners Inquest is not advisable at this time, for the following reasons:

(a) A coroners jury may give a finding of Accidental—hampering the Investigation.

(b) They could Rule Homicide—Criminal negligence—or other, that night [sic] force us to Charge without evidence to get through Magistrates Court.

(c) An Inquest would force any Suspect to get an Attorney—who would certainly advise him to refuse to testify, or talk to any Investigator.

9. Interrogation: With all Photos, Lab Reports, Statements, and as last resort a request for Polygraph examination: are the only weapons left to work on a Suspects [sic], (Guilty Knowledge) if any is present.

10. The Coroner will only call an inquest, if requested by you; And I would respectfully request that you allow us to continue this Investigation in the manner we have found effective in the past.

R. 2751ag.

District Attorney Little indicated that Detective Collier had strong feelings that the shooting was not accidental. He also testified that Coroner John Conarton was "hellbent that this was accidental." R. 1481ag. District Attorney Little, along with the investigating officers (Detective Collier, Trooper Fekette and Trooper Salinkas of the Pennsylvania State Police), did not want Coroner Conarton to release a death certificate noting accidental death because they believed sources of information from the community would dry up if that determination was made. He testified that they had several conferences with Coroner Conarton to prevail upon him to delay the release of the death certificate. He was able to delay the release of the death certificate for 10 days, and explained that Detective Collier's reference in his letter to the fact that "time was vital" reflected that the delay had been encouraged. R. 1482ag. When the death certificate was issued on June 12, 1976, it reflected that Mr. Dillon's death was accidental. R. 2758ag–2759ag. Coroner Conarton never revised his determination.[7]

District Attorney Little testified that he relied on the investigators to continue their investigation and that he believed all of the evidence had been accumulated by the time that he left office. R. 1491ag. He subsequently made the determination that there was insufficient evidence to warrant the prosecution of Dr. Scher. From the time of the shooting

7. A revised certificate of death was signed by Robert A. Barton on December 1, 1995. The revised certificate indicated that the immediate cause of death was a gunshot wound of the chest and the manner of death was described as homicide. R. 2760ag.

in 1976 until District Attorney Little left office in 1980, no arrest was made.

Laurence M. Kelly succeeded Little as District Attorney in 1980. District Attorney Kelly served in office for two terms from 1980 to 1988. He testified that Detective Collier was still employed as an investigator during his tenure, and that Detective Collier retired prior to the completion of his two terms. For the 8 years he served in office, the matter was dormant. Not only was there no ongoing investigation of the shooting incident, but District Attorney Kelly had no knowledge even that there was an existing file on the matter.

District Attorney Kelly testified as follows:

Q. When you took over the office of District Attorney, did anyone tell you where the file was concerning the death of Martin Dillon?

A. No.

Q. Did you ever find the file?

A. I never found it nor did I look for it. I had no idea that it was there or if it was there.

Q. From—just so I understand, Larry, what you are saying, from the date you took office to the date you left, you never looked for the file and you never knew it was there?

A. That's correct.

Q. Did Collier have any conversation with you about the file?

A. No.

Q. Did you open a new file on the death of Martin—strike that—on the death of Martin Dillon?

A. No.

Q. Did you initiate any investigation concerning the death of Martin Dillon?

A. No.

Q. Did you gather any additional evidence concerning the death of Martin Dillon?

A. I did not.

R. 1513ag–1514ag.

District Attorney Kelly further testified that he had not seen the letter dated June 9, 1976, from Detective Collier to former District Attorney Kelly, and did not ever review the evidence that had been collected as a result of the 1976 investigation. He did not conduct any meetings with the Pennsylvania State Police concerning Mr. Dillon's death nor did he receive any correspondence from the State Police on the matter. District Attorney Little did not receive any request from any law enforcement officer to conduct any scientific examination on the evidence accumulated in the investigation into the death. He was never made aware of any investigation being actively conducted by the State Police or any other law enforcement agency while he was District Attorney. R. 1514ag–1516ag.

In January of 1988, Jeffrey B. Snyder became the District Attorney. He served two concurrent terms from 1988 to 1995. He had previously served as an assistant district attorney under District Attorney Kelly in 1987. As an assistant district attorney, the matter had never been discussed with him and he was not aware of the existence of any file in the District Attorney's office. R. 1591ag.

A year after District Attorney Snyder was elected, he was contacted by a social acquaintance who was the son-in-law of Lawrence Dillon (Martin Dillon's father) and was asked to have a meeting with the Dillon family. He agreed to meet with the family. The family requested that he not involve any of the detectives who were part of the District Attorney's office. The family members expressed their concerns over the investigation undertaken by the Pennsylvania State Police. After the meeting, he indicated that he would review the case, including the initial Pennsylvania State Police investigation. R. 1593ag; 1597ag.

His review of the official file in the District Attorney's office indicated that it "contained little to no information." R. 1592ag. District Attorney Snyder arranged meetings with

Lawrence Dillon and the State Police to address Dillon's concerns. The State Troopers involved in the investigation, Troopers Salinkas and Fekette, participated in the meetings. District Attorney Snyder examined the original criminal reports, the State Police file and additional materials provided by Lawrence Dillon summarizing his own thoughts. He also made a site visit to the hunting camp. R. 1598ag.

Thirteen years after the investigation ceased, it was agreed that a presentation of the case would be made to a panel of medical experts who were assembling at the University of Pennsylvania in Philadelphia in May 1989. Dr. Isadore Mihalakis, who subsequently testified as a witness for the Commonwealth at trial, made the presentation on behalf of the Commonwealth.[8] District Attorney Snyder testified that he was present merely as an observer and described what occurred following the presentation:

> By my count there were twenty-nine individuals present in terms of who would vote on this matter, straw poll fashion. And less than half of those individuals indicated that on the known facts that they felt there was a basis for homicide. The remainder voted either for intentional or accidental self-infliction of the gunshot wound. I viewed that as an overwhelming defeat for the prosecution, and any theory of death caused by another.

R. 1601ag; 1617ag. His recollection was that of the 29 who voted, only 12 believed that the manner of death was homicide.

District Attorney Snyder did not file charges against Dr. Scher after those efforts. He testified that the results of the presentation and the variance of opinions expressed by a number of the State Police officers who had been involved in the investigation played heavily in his determination that a successful prosecution could not be mounted in 1989. He identified the initial investigators, Troopers Fekette and Salinkas, as two officers who were undecided under the state of the evidence at that time. R. 1625ag.

---

**8.** District Attorney Snyder did not select Dr. Mihalakis to make the presentation. The presentation itself was undertaken by the State Police. R. 1616ag.

He testified further that in 1989, no request was made by Dr. Mihalakis for an exhumation of Mr. Dillon's body to conduct another autopsy. The subject of exhumation was discussed, however, with the State Police:

In fact, I will take you back to that panel presentation in May of 1989, when I approached a number of persons who voted—again, I can't give you names. I had never met these individuals. I was there as an observer.

I—as I have already indicated, I felt this was a setback as far as any straw poll that had been taken. So I took the initiative to approach several after the presentation and inquire directly of them what more might be done to advance this investigation, and whether an exhumation and additional autopsy would be of any benefit.

I was given no guidance by those individuals as to what might be accomplished. And I was basically led to be [sic] it would be a fishing expedition. And under the state of the evidence at that time—and you have touched on some of it elicited here in my testimony—I didn't feel there was sufficient basis to come before the Court and request an exhumation.

R. 1628ag.

District Attorney Kelly acknowledged that the Commonwealth had possession of the physical evidence that was collected after the shooting. This evidence included: the clothing worn by Dr. Scher and Mr. Dillon on the date of the shooting; Dr. Scher's 16–gauge shotgun, Mr. Dillon's 20–gauge shotgun, ammunition and shells found at the scene of the shooting, shooting glasses and ear protectors found at the scene, clay birds, bird thrower, and sections of a log. R. 1632ag–1634ag. He also admitted that he had discussions with Dr. Grace and Coroner Conarton, and indicated that the State Police had interviewed them again as part of the process of revisiting the investigation. R. 1643ag. The record reflects that none of the interviews were ever recorded or preserved.

District Attorney Snyder was critical of the investigation that had been done. He testified that the investigation was

"not getting done; not properly." R. 1737ag. In 1994, eighteen years after Mr. Dillon's death, two different State Police officers (Troopers Schmidt and Stroud) were assigned to the case. The investigation was taken away from the direct supervision of the barracks originally responsible for the investigation.

After the two troopers were assigned to the case, District Attorney Snyder obtained a court order in 1995 granting permission to exhume Mr. Dillon's body for the purpose of conducting a second autopsy. The second autopsy was done by Dr. Mihalakis, who had presented the case in 1989 to the panel of medical experts. The second autopsy took place on April 29, 1995. Thereafter, the death certificate was amended to change the manner of death from accident to homicide.

District Attorney Kelly testified that he could not identify any additional physical evidence that the troopers examined that was not examined before they became involved in the case. He further testified that any of the witnesses interviewed by the troopers would have been available to be interviewed in 1976. R. 1716ag.

This record demonstrates that there was no ongoing investigation into the death of Mr. Dillon. The investigation was dormant for most of the 20 years of pre-arrest delay. Indeed, for 8 of those years, the "investigation" was non-existent. Not only did District Attorney Kelly not pursue any investigation from 1980 through 1988, no one had even informed him that a file existed in this case. District Attorney Kelly, the chief law enforcement officer for Susquehanna County, was never advised of this case by his predecessor or any law enforcement agency.

There is no basis to conclude that the pre-arrest delay was required for further investigation. The record establishes that the Commonwealth did not have a proper reason for the inordinate delay. As the Superior Court stated,

> The investigation conducted by the Commonwealth was far from proper. In 1996, it had in its possession no evidence or witness that was not available to it in 1976 when the shooting occurred. Moreover, we cannot find, prior to

the commencement of the most recent investigation in 1994, any instance where the Commonwealth diligently pursued an investigation in this case. We find the Commonwealth's inactivity regarding this case to be grossly negligent, as it has provided us with no proper reasons for such an egregious prolonged delay.

*Commonwealth v. Scher*, 732 A.2d 1278, 1287 (Pa.Super.1999) (citation omitted).

As noted previously, the Commonwealth did not attempt to argue before the trial court that the investigation was ongoing or that the unusual pre-arrest delay was proper. The prosecutor was extremely critical of the handling of the investigation, but focused his argument only on the issue of whether the Commonwealth had intentionally delayed prosecution solely to gain a tactical advantage over the accused. The prosecutor did not address circumstances, such as occurred here, where "[w]hether done intentionally or not, the Commonwealth gained a tremendous strategic advantage against the [accused] due to the passage of time and the loss of critical defense testimony through death and memory loss." *Snyder*, 713 A.2d at 605.

Although the Commonwealth has now offered additional testing of the physical evidence that had been collected in 1976 as an excuse for the extensive pre-arrest delay, the record establishes that the facilities and experts who conducted the testing were available to the Commonwealth when the investigation began. "Moreover, any new tests performed by the Commonwealth and the Federal Bureau of Investigation failed to reveal any new and/or relevant information that could not have been discovered by testing procedures available to them in 1976." *Scher*, 732 A.2d at 1287.

The next question is whether the 20 year pre-arrest delay resulted in actual and substantial prejudice to Dr. Scher. The Superior Court determined that Dr. Scher had suffered actual and concrete prejudice as a result of the pre-arrest delay.[9] The Superior Court stated:

9. Although the Superior Court used the words "actual and concrete", rather than "actual and substantial" to describe the prejudice suffered

Initially, we note that there were numerous instances at the preliminary hearings and at trial where witnesses were unable to remember many facts because their memories had waned over the preceding twenty years. Moreover, many key witnesses were deceased at the time of trial.

**One of the issues upon which the Commonwealth focused was the distance between the barrel of the gun and Dillon's chest. The Commonwealth's expert, Dr. Mihalakis, testified at a pre-trial hearing that the barrel of the gun was approximately three to five feet away from Dillon's body when the shot was fired. He, therefore, opined that this shooting could not have been an accident or suicide. Dr. Mihalakis based this conclusion on his autopsy finding that there was no blackening or powder found at the wound of entry. Significantly, this was contrary to Dr. Grace's findings, which were recorded in his autopsy report dated June 3, 1976. In that report, Dr. Grace noted that the area around the penetration was darkened with what were apparent to him as powder burns. We will never know why and how Dr. Grace arrived at his conclusions as he died in 1995 without having had an opportunity to explain his findings.**

Detective Collier, the county detective assigned to the case in 1976, was of the opinion that Dillon's death may not have been an accident. We, however, will never know why he made such a determination or why he did not further

by Dr. Scher, I would not quarrel with its choice of words. I cannot fathom how those words could be twisted to suggest that the protections afforded to an accused under the Due Process Clause could be lost by the use of a particular word. Whether one uses the words "actual and concrete", "actual and substantial", or "actual" alone (as we recently did in *Snyder*), the U.S. Supreme Court's articulation in *Marion* and *Lovasco* of this prong of the test requires this Court to determine whether an accused has been hampered in his defense because of the Commonwealth's failure to preserve critical evidence and the observation of witnesses. This "delicate judgment" is made based upon the circumstances of the individual case. No magical words will make this analysis of due process automatic, and the use of different words will not make prejudicial pre-arrest delays less significant under the Pennsylvania and U.S. Constitutions.

pursue the investigation as he also died prior to Dr. Scher's arrest.

Also deceased at the time of trial was John Conarton, who was the Susquehanna County Coroner at the time of Dillon's death. Coroner Conarton's signature appeared on Dillon's initial death certificate, and it was his opinion that the death was accidental. Due to Conarton's death, Dr. Scher was not able to question Conarton at trial. We will, therefore, never know why Conarton believed Dillon's death to be accidental.

Whether or not the prolonged delay by the Commonwealth in prosecuting its case was intentional, it caused the Commonwealth to gain a remarkable advantage over Dr. Scher. As stated above, certain important witnesses were deceased and, therefore, unavailable to Dr. Scher in presenting his case. Moreover, numerous witnesses called by both the Commonwealth and Dr. Scher were unable to remember facts relevant to this case. Our appellate courts, along with the United States Supreme Court, have found substantial and actual prejudice where memories of witnesses have dimmed, witnesses have become unavailable, and evidence has been lost due to prosecutorial delay. *Marion,* **supra;** *Snyder,* **supra.** This prejudice, however, cannot be speculative in nature, it must be actual and concrete. *Snyder,* **supra.** See *[Commonwealth v.] Sneed,* [526 A.2d 749 (1987) ],(where witness died during delay in filing charges defendant is required to show how witnesses would have tended to exculpate him). Presently, we find that Dr. Scher's case suffered actual and concrete prejudice due to memory loss and the death of important witnesses whose testimony could have explained the contradictions between the findings of the initial investigation conducted in 1976 and those of the more current investigation conducted nearly eighteen years later.

732 A.2d at 1285–86 (emphasis added).

In his brief, Dr. Scher's counsel has identified categories of the evidence that was lost, destroyed or irretrievably altered during the 20 year delay:

1. The wound of entry was lost or destroyed by the Commonwealth, (R.263ag, 502ag, 5747ag, 5920ag, 5956–57ag), and deteriorated over the twenty year delay, (R. 4142–43ag, 4148–49ag), before defendants' experts could examine its size or shape. (R. 273–80ag).

2. Between 1976 and 1995, the wound track and body of Dillon suffered "extensive autolytic and decompositional changes." (R. 4148–49ag). The changes were particularly severe around the area of the wound of entry. *Id.* The body was also washed and embalmed before the first autopsy. (R. 2761ag, 5949ag). These changes affected the size of the wound, and the presence of gunpowder residue in the wound track and on the skin around the wound, indicative of range of fire. (R. 4157ag, 4162ag, 5279ag, 5949ag).

3. Dr. Grace routinely made audio recordings during the many autopsies that he performed. He made a recording in this case. (R. 3762ag). It was never collected by the Commonwealth, and was lost or destroyed between 1976 and 1996. (r. 3762–63ag).

4. The used, unused and discarded ammunition on the ground and in boxes at the incident scene were never collected by the Commonwealth, was lost or destroyed over the decades-long delay and was unavailable at the time of trial. (R. 2824ag, 3761–62ag). The presence of spent number four shells at the scene would have seriously damaged the Commonwealth's theory of the case. (R. 2885–86ag, 2894ag, 3360–65ag, 6578–79ag).

5. Photographs of the alleged victim and incident scene were taken by game protectors on June 2, 1976. (R. 1638–39ag). They were either lost or destroyed during the twenty year pre-arrest delay. (R. 1638–41ag).

6. After 1976, the ejector was removed from the shotgun that killed Dillon and lost. (R. 4980–90ag, 5150ag). Thus, the gun could not be properly tested (jar/shock tests). (R. 5138ag, 5150ag).

7. During the course of the pre-arrest delay, bloodstains inside the barrel of the shotgun (indicative of close range discharge), (R. 3996–97ag), were destroyed when the gun

was discharged before proper testing of it could be done. (R. 4993–94ag).

8. Because of the twenty year pre-arrest delay, the defendant could not possibly perform a psychiatric autopsy to ascertain Martin Dillon's mental condition at the time of his death. (R. 2602–04ag, 2612–15ag, 2625–26ag, 2637ag.)

9. Memories faded during the pre-arrest delay. (R. 1445ag, 1465ag, 1473ag, 1834ag, 1932ag, 1958–59ag, 2010ag, 2286–87ag). Furthermore, the defendant was confronted with witness's present recollection of events that occurred twenty years ago.

Brief for Appellee at 15–16.

I agree with the Superior Court that the pre-arrest delay resulted in actual and substantial prejudice to Dr. Scher because of the death of important witnesses who could have explained the observations made during the original autopsy and the significance of those findings in determining the manner of death. Dr. Grace was the only physician who examined the body at the time of the incident. He recorded findings from his original autopsy that were inconsistent with the Commonwealth's theory of how the shooting occurred and the medical testimony offered by the Commonwealth at trial.

Dr. Grace was available to the Commonwealth from 1976 until his death on July 27, 1995. Although three individuals served as District Attorney during this time, two of whom consulted with him on this shooting, no effort was made to obtain a recorded or written statement from Dr. Grace to address the significance of his findings in the autopsy report. Despite the fact that investigators had discounted Dr. Scher's 1976 explanation of how the shooting occurred, no investigator obtained a statement from Dr. Grace detailing his findings or explaining the observation that he made on June 3, 1976, of darkening around the wound area.

No effort was made to preserve the recollection of the only medical expert who examined the body in 1976 at any time during the next 19 years. Even as the possibility of exhuming the body for examination was considered in 1989 by District

Attorney Snyder and the State Police, the Commonwealth failed to make such efforts. Nor were any efforts undertaken when the investigation was renewed in 1994.

In fact, the only recording detailing the autopsy findings made by Dr. Grace was lost by the Commonwealth. Trooper John Fekette, who retired from the State Police in 1989, testified about this loss of evidence, in addition to the loss of other evidence, as follows:

Q. Now, you talked about the autopsy. And as I understand it, you were present at the time of the autopsy?

A. Yes, sir.

Q. Isn't it true that at the time of the autopsy Dr. Grace made a tape-recording of findings; isn't that true?

A. Yes, sir.

Q. And isn't it true that that tape-recording is lost?

A. That's what I understand.

R. 3762–3763ag.

The prejudicial effect of the pre-arrest delay because of the death of Dr. Grace is undeniable. Although the record reflects that Dr. Scher was prejudiced by the loss of other physical evidence and by the death of several significant witnesses, I find that the prejudice suffered by Dr. Scher because of the death of Dr. Grace in itself is dispositive of the issue of whether Dr. Scher was deprived of his due process rights. For this reason, I will focus the discussion on the devastating impact of the loss of Dr. Grace as a witness.

Dr. Grace may not have been available to testify as a witness at trial, but his qualifications and credibility were under attack by the Commonwealth. The Commonwealth castigated his competence and his autopsy findings. From the Commonwealth's perspective, this was imperative because Dr. Grace's findings could not be explained in a way that would support the Commonwealth's theory that the shotgun was fired from a distance.

The autopsy report prepared by Dr. Grace on June 3, 1976, set forth the following findings. The highlighted portion

reflects the crucial findings that the Commonwealth was unwilling to accept and vociferously disputed at trial:

History given of having been involved in a hunting accident yesterday, 6/2/76 about 6 p.m. He is a white male, age about 30 years, being about 5′1″ or 5′11″ in height and weighing approximately 180 pounds.

In the central portion of the chest, slightly to the left of the sternum and about 3″ below the upper portion of the sternum, is a hole in the chest, roughly being oval in character that measures about 1½″ in length and roughly 1″ in width. It is a penetration hole, apparently the result of a shotgun wound which proceeds in an inferior and a lateral direction toward the lateral portion of the chest. There is a ecchymotic area in the area of the posterior axillary line at about 6″ below the axilla, an area of fullness with surrounding eccymosis which is thought possibly to contain the slug from the gun bullet. There is no other evidences of contusions or lacerations found on the body.

The body having been embalmed at the time of this examination, there is moderate post mortem rigidity. There is moderate post mortem lividity in the dependent portions.

The chest was not opened in the usual manner. However, the area of the wound of entry as described was widely excised and the skin was turned back and then the chest, from then on, was opened in the usual manner. The chest plate was then removed. **It was observed at this point that the gunshot hole as previously noted on the exterior of the skin that there was no apparent powder burns. However, as the hole was traced through the anterior chest wall in a lateral and a slightly inferior direction as described, the area around the penetration was somewhat darkened with what was apparently powder burns and, surrounding this, of course was a large amount of free and some clotted blood.**

The heart was found to be about ⅓ to ½ removed from the force and the impact of this charge. The left ventricle was entirely missing and most of the left auricle was gone. The

heart was surrounded with a large amount of blood and various portions of shot pellet were found in the heart and beyond. The heart was removed and examined, it being about, as stated, ½ amputated by the force of this charge. A large amount of blood was found in the lower portion of the chest cavity.

The left lung was also involved in the destruction associated with the impact of the charge. The wad was found in the posterior portion of the left chest wall. However, there was no penetration discernible in this area. Numerous shot pellets were found on the posterior chest wall. Also numerous shots had apparently entered and some had permeated through the diaphragm. The right lung was apparently not involved in the injury. Numerous fractures of the left chest wall. There is involvement of the musculature of the same with numerous fractures of ribs and with numerous pellets throughout the entire area.

R. 2761ag. The cause of death was noted as a gunshot wound of the chest.

The Commonwealth's theory at trial was that Mr. Dillon had been shot by Dr. Scher from a distance. Dr. Grace's autopsy findings regarding the presence of darkening around the area of the wound that appeared to be powder burns contradicted the Commonwealth's theory. The presence of darkening around the wound area was consistent, however, with a close range gunshot wound. The autopsy findings supported Dr. Scher's testimony at trial that the shotgun discharged accidentally, during a struggle for the shotgun. The live testimony of Dr. Grace could have addressed the physical evidence that he observed and the findings in his autopsy report. Dr. Grace's testimony could have demonstrated that powder burns were visible during the autopsy, demonstrating that the shotgun did not fire from the distance that the Commonwealth's expert witnesses suggested at trial.

In addition, Dr. Grace could have testified to his observations regarding the size of the entry wound. Dr. Grace was the only expert witness who observed the entry wound before the body was embalmed and buried. It was conceded by the

Commonwealth's witnesses that the embalming process and the extensive decomposition and deterioration that occurred in the 19 years while the body was buried had affected their ability to determine the size of the entry wound.

Dr. Grace could have testified also regarding whether or not the entry wound was scalloped.[10] His autopsy report did not set forth any finding that scalloping of the wound had been observed. The presence or absence of scalloping is likewise relevant to the range from which a weapon is fired. The absence of scalloping would indicate that the muzzle of the gun was close to the skin surface at the time of discharge. R. 5249ag, 5770ag.

The expert witnesses proffered by the Commonwealth and the defense disagreed as to whether scalloping was absent, but only Dr. Grace had the opportunity to observe the area of the wound in its original state. The embalming process included the sewing of the wound of entry, which altered the original state of the wound. The expert witnesses who testified at trial after examining photographs taken at the autopsy disagreed as to whether the photographs themselves depicted scalloping of the wound. The only factual recitation regarding the condition of the body could have been given by Dr. Grace, based upon his direct observation of the body. His testimony, however, could not be presented to the jury because of the Commonwealth's unexcused delay in investigating this matter properly and filing charges.

In the absence of Dr. Grace's testimony on this critical issue, the jury was left with no witness to testify regarding the original state of the wound when Dr. Grace examined the body. Instead, the jury was required to speculate as to whether Dr. Grace was capable of making such an observation, whether in fact he had made such an observation but was

10. Dr. Michael Baden, who testified as a defense witness, explained the significance of scalloping. Dr. Baden, the medical examiner for the New York State Police, was board certified in the field of anatomic, clinical and forensic pathology. He stated that "[s]calloping, when it's used to describe a shotgun wound, refers to small semi-circular irregularities along the margin of the entrance wound caused by the gradual dispersion of shot pellets." R. 5930ag.

incapable of understanding its significance, or in fact had not observed scalloping to the detriment of the Commonwealth's case. Additionally, all of the expert witnesses were made to draw their conclusions from a set of assumed facts and unlike Dr. Grace, they could not provide a foundation of the facts.

For example, Dr. John Shane, Chairman of the Department of Pathology at Lehigh Valley Hospital, testified regarding this matter. Dr. Mihalakis, who also testified for the Commonwealth regarding the matter, was a member of that same department. Dr. Shane had examined the autopsy photographs and concluded that no scalloping was visible. During his testimony regarding the photographs, Dr. Shane discussed the significance of the fact that Dr. Grace's autopsy report did not refer to the presence of scalloping:

Q. In addition to that, did any physician personally observe that wound on June 3rd, 1976?

A. Yes.

Q. And who was that?

A. That was Dr. Grace.

Q. Did he make any notation in his report concerning a scalloping or non-scalloping of the wound?

[PROSECUTOR]: If your Honor please, the absence of evidence is not evidence. **Besides, Dr. Grace was not even a hospital pathologist. He was an ordinary physician.**

[DEFENSE COUNSEL]: Judge, is this an objection or a speech?

THE COURT: He had an objection.

[DEFENSE COUNSEL]: I am asking questions and he is objecting.

THE COURT: I am going to overrule the objection. Answer the question.

A. Dr. Grace observed this wound at the time these photographs were taken. These were taken at the time of his autopsy. He did not describe scalloping. Scalloping of a wound margin in terms of a determination of muzzle distance is sophomoric in terms of a physician's examination of a wound of entry. I mean, it is—it is a very basic thing

you look for. I believe Dr. Grace was able to tell if there was scalloping or no scalloping if it were present. I mean, it is so sophomoric. He, obviously, in my opinion, would have included it in his report.

[PROSECUTOR]: That is objected to. He didn't say there was no scalloping. He didn't say anything one way or the other.

THE COURT: Sustained.

R. 5241–42ag (emphasis added).

The Commonwealth challenged the veracity of Dr. Grace's autopsy findings and impugned his qualifications. In an attempt to minimize crucial physical findings made during Dr. Grace's examination of the body that the Commonwealth's expert witnesses could not otherwise explain, the prosecutor characterized Dr. Grace as a medical witness who lacked the requisite skills to conduct an autopsy. Over strenuous and repeated objections by defense counsel, the trial court permitted the prosecutor to engage in a character assassination of Dr. Grace.

The Commonwealth's witnesses harshly criticized Dr. Grace's qualifications, but not one of the witnesses could testify that they were familiar with Dr. Grace's abilities from their own personal experiences with him during his medical career. Instead, the Commonwealth's expert witnesses were permitted to speculate that Dr. Grace was not competent to make the autopsy findings that refuted the Commonwealth's theory because the Commonwealth's expert witnesses' qualifications were "superior" to Dr. Grace's qualifications. The record amply demonstrates that Dr. Scher suffered actual and substantial prejudice as a result of the loss of Dr. Grace as a witness. The availability of other expert witnesses to testify on Dr. Scher's behalf could not dissipate this prejudice because none of those witnesses had observed the body as it appeared during the autopsy.

The Commonwealth's attack on Dr. Grace went to ridiculous lengths as demonstrated by the following testimony of its witness, Dr. Joseph H. Davis. Dr. Davis, formerly the Chief

Medical Examiner of Dade County, Florida, testified about Dr. Grace's autopsy finding "that the area around the penetration was somewhat darkened by what was apparently powder burns."

Q. Now, did you review Dr. Grace's report in this case?

A. Yes, I did.

Q. Now, did he make certain comments in that report regarding this matter?

A. Yes.

Q. Now, would you explain to the jury what they were and what signature [sic], if any, you attach to them?

A. In reference to gunpowder soiling, as I recall the autopsy report by Dr. Grace, he used the term—and he's talking about the tissue under the skin, along the wound pathway—"somewhat darkened," which then he goes onto [sic] interpret as evidence of gunpowder soil.

**Now, my interpretation of that, as a pathologist who describes things and has done it over the years, the description "somewhat darkened" indicates, if I wrote it, that I was not sure because the word somewhat means indeterminate.**

[DEFENSE COUNSEL]: Objection, Your Honor. That calls for speculation.

THE COURT: Overruled.

* * *

Q. Proceed.

A. Well, I interpret the modification word in there "somewhat" as meaning insecure, not certain, maybe, question.

[DEFENSE COUNSEL]; Objection.

[PROSECUTOR]:

A. That's the way I interpret—

THE COURT; Overruled.

[PROSECUTOR]:

A. —those words,

Q. All right. Now, can you tell us—can you tell us why you interpreted it that way in terms of the definition of that word?

A. Well, that word itself is a word that means indeterminate, uncertain, not certain of what, et cetera. It's a modifier. And if I use that word, that's the way I use it. That's how I understand that word as it's used in the English language.

Therefore, I would interpret this as indicating that the person who used those words is not of the high degree of certainty as—

R. 6118–19ag (emphasis added).

Over defense counsel's objection, Dr. Davis was also permitted to testify that a forensic pathologist has training and experience in detecting, with the naked eye, the presence of gunpowder residue, while a general physician does not. R. 6123ag. This overbroad generalization about the relative qualifications of forensic pathologists and physicians to detect gunpowder residue was intended to discredit Dr. Grace's findings before the jury, without any personal knowledge or evidence of Dr. Grace's training and experience.

Notably, Dr. Davis did not attempt to explain how the forensic pathologists who testified at trial arrived at diametrically opposed conclusions regarding the presence of gunpowder residue, the absence or presence of scalloping, and the distance away from the body at which the shotgun discharged. Although he opined that these matters were peculiarly within the specialized experience of those trained as forensic pathologists, he proffered no opinion as to why the expertise of so many eminent pathologists left the significant issues unresolved.

The limitations, as well as the importance, of expert witnesses are demonstrated in this case. It is for this reason that I cannot accept the plurality's reasoning that Dr. Scher did not suffer actual and substantial prejudice because he could present expert witnesses on his behalf. Under the circumstances of this case, the most critical evidence for the

defense was that obtained by Dr. Grace through his physical observation of the body at the time of the shooting. The loss of this evidence resulted directly from the Commonwealth's improper pre-arrest delay.[11]

Dr. Scher was prejudiced in his defense to the charges against him by the loss of Dr. Grace as a witness. Dr. Grace could have testified to his visual observations without speculation as to what the physical examination of the body revealed to him. The findings set forth in his autopsy report would have been the subject of extensive direct and cross-examination. The jury would have had an opportunity to weigh his testimony explaining those findings that were crucial to a determination of whether the shotgun discharged at close range to the body.

*Ultimately, even forensic science depends upon the preservation of evidence.* The Commonwealth's delay in filing charges against Dr. Scher deprived him of evidence critical to his defense. As a result, Dr. Scher was deprived of his due process rights under the Pennsylvania and United States Constitutions.

I dissent.

Justice CAPPY joins this dissenting opinion.

---

**11.** This distinguishes the case before us from circumstances where the loss of the witness or evidence is not occasioned by the Commonwealth's delay.